YEGAN, J.
*617 Over 50 years ago, wise and prescient Chief Justice Phil Gibson planted the judicial seed for what we now call the "community caretaking" exception to the Fourth Amendment. We apply it here. ( People v. Roberts (1956) 47 Cal.2d 374, 379-380, 303 P.2d 721 ( Roberts ); see also People v. Ray (1999) 21 Cal.4th 464, 471, 88 Cal.Rptr.2d 1, 981 P.2d 928 ( Ray ).)
Willie Ovieda appeals his conviction by plea to manufacturing concentrated cannabis ( Health & Saf. Code, § 11379.6, subd. (a) ) and possession of an assault weapon ( Pen. Code, § 30605, subd. (a) ), entered after the trial court denied his motion to suppress evidence ( Pen. Code, § 1538.5 ). Pursuant to a negotiated plea, probation was granted with 180 days county jail and outpatient mental health treatment.
Appellant contends his Fourth Amendment rights were violated when officers, in responding to a 911 call that he was about to shoot himself, made a "cursory search" of appellant's residence to make sure no one was hurt and no firearms were lying about.[1] The trial court factually found that *69 the search was a reasonable exercise of the officers' community caretaking duty. We affirm because there is no reason to apply to the exclusionary rule. As we shall explain, the instant entry and "cursory search" had nothing to do with the gathering of evidence to support a criminal prosecution. This is, of course, the lynchpin for application of the exclusionary rule. When a person unsuccessfully attempts suicide in his residence with a firearm, and thereafter comes outside, the police may enter the residence to perform a "cursory search" pursuant to their "community caretaking" duty.
Facts and Procedural History
On the evening of June 17, 2015, appellant's sister told a 911 operator that appellant was threatening to kill himself and had attempted suicide before. Santa Barbara Police Officer Mark Corbett responded to the 911 call. A second officer telephoned Trevor Case inside the house. Case was appellant's friend. Case went outside and reported that appellant had threatened to *618 commit suicide and tried to grab several firearms in his bedroom. Case and his wife had to physically restrain appellant to keep him from using a handgun and a rifle to kill himself. Case's wife pinned appellant down as Case searched the bedroom for other firearms. Case moved a handgun, two rifles, and ammunition to the garage but did not know whether appellant had additional firearms or weapons in the house.
Appellant agreed to come outside, was detained, and falsely denied having made suicidal comments or that he had any firearms. Appellant said he was depressed because a friend committed suicide the week before. Officer Corbett described the situation as "emotional and dynamic." He believed a cursory search was necessary because it was unknown how many more weapons were in the house, whether the weapons were secure, and whether anyone inside the house needed help. It was a concern because the person who made the 911 call, appellant's sister, was not at the scene and the officers did not know anything for sure. Officer Corbett believed he was "duty bound" to make a safety sweep to make sure no one inside was injured or needed medical attention. A second officer, Officer Daniel Garcia, agreed a safety sweep was necessary to confirm that; 1. there were no other people in the house; 2. nobody else was hurt; and 3. there were no dangerous weapons or firearms left out in the open.
Officer Corbett and a second officer made a cursory sweep of the house and saw, in plain view, a rifle case, ammunition, magazines, and equipment to cultivate and produce concentrated cannabis.
There was a large, industrial drying oven with tubes, wires, and ventilation ducts that led to the garage, as well as marijuana and concentrated cannabis in plain view. Based on 15 years in narcotics-related investigations, Officer Corbett believed the marijuana lab posed an immediate danger because manufacturing concentrated cannabis is "a volatile process that involves heat and when mistakes are made explosions and fires can occur."
Inside the garage, officers saw three rifles and a revolver in a tub. Two rifles were automatic or semi-automatic assault rifles that Officer Corbett believed were illegal. The officers also found four high capacity magazines for an assault style weapon, a firearm silencer, a long range rifle with a scope, more than 100 rounds of ammunition, equipment for a hash oil laboratory, butane canisters, miscellaneous lighters and burners, a marijuana grow, and a bucket filled with marijuana shake. The firearms included a .50 caliber rifle, an Uzi sub-machine gun, a .357 caliber revolver, *70 a pistol-grip 12 gauge shotgun, and a .223 caliber sub-machine gun.
Appellant brought a motion to suppress evidence. The prosecution argued that the entry into appellant's residence was justified under the community *619 caretaking exception and the protective sweep doctrine.[2] The trial court ruled that the community caretaking exception is "what guides the Court's decision" and denied the motion to suppress evidence. The trial court found the officers' testimony credible as to "what they were concerned about and what they didn't know. And so I [find] it credible that they wanted to remove firearms, they didn't know if there were others in the residence, either victims or other people who might cause a harm." It expressly found that the officers were "not required to accept Mr. Case's word that he removed the firearm that Mr. Ovieda had reached for. ... And I believe under these circumstances that the officers would be subject to criticism, in fact, if anything had occurred that they would be judged neglectful in not entering the residence and doing what was described as quick search, ... looking in closets, looking for other people, and looking for other weapons."
Community Caretaking Exception
Appellant argues that the entry into his residence violated the Fourth Amendment. On review, we defer to the trial court's express and implied factual findings which are supported by substantial evidence and determine whether, on the facts so found, the search was reasonable under the Fourth Amendment. (E.g., People v. Glaser (1995) 11 Cal.4th 354, 362, 45 Cal.Rptr.2d 425, 902 P.2d 729.) The trial court's express factual findings are fatal to this appeal.
In Ray , supra , 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, our Supreme Court stated that the community caretaking exception to the Fourth Amendment permits police to make a warrantless search of a home if the search is unrelated to the criminal investigation duties of the police. ( Id. at p. 471, 88 Cal.Rptr.2d 1, 981 P.2d 928.) "Upon entering a dwelling, officers view the occupant as a potential victim, not as a potential suspect." ( Ibid . ) "Under the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry" to preserve life or protect property. ( Id. at p. 473, 88 Cal.Rptr.2d 1, 981 P.2d 928.) Officers are expected to " ' "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," "resolve conflict," ... and "provide other services on an emergency basis." ...' [Citation.]" ( Id. at p. 471, 88 Cal.Rptr.2d 1, 981 P.2d 928.)
Such is the case here. Officer Corbett responded to the 911 call to help a suicidal person. The cursory search had nothing to do with a criminal investigation and no one claims the 911 call was a ruse or subterfuge to gain entry and search for evidence of a crime. " '[C]ommunity caretaking' ..., *620 [is] 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' [Citation.]" ( Colorado v. Bertine (1987) 479 U.S. 367, 381, 107 S.Ct. 738, 93 L.Ed.2d 739.)
Appellant argues that Ray has no binding precedential value because it is only a *71 plurality opinion. (See, e.g., People v. Karis (1988) 46 Cal.3d 612, 632, 250 Cal.Rptr. 659, 758 P.2d 1189.) He contends the officers were required to leave when appellant denied that he was suicidal. The argument is premised upon the theory that a suicidal person has the Second Amendment right to possess and bear firearms and that officers responding to a 911 call that someone is threatening suicide must leave when the person comes outside and says there is no problem. We assess the reasonableness of the officer's actions at the time they undertook them.
Officer Corbett responded to a 911 call from a concerned family member that appellant was about to take his life and had attempted suicide before. Appellant's friend, Trevor Case, confirmed that appellant tried to reach for a firearm and shoot himself. Case feared that appellant would try to hurt himself and that there were other weapons or firearms in the house. There was an on-going safety concern because appellant lied about the firearms and his suicidal ideation. Appellant was detained and handcuffed. By his actions, appellant put himself at risk, his friends at risk, and the responding officers at risk. ( Adams v. City of Fremont (1998) 68 Cal.App.4th 243, 271, 80 Cal.Rptr.2d 196 [Police officers providing assistance at the scene of a threatened suicide must concern themselves with more than simply the safety of the suicidal person. Protection of the physical safety of the police officers and other third parties is paramount]; see also Allen v. Toten (1985) 172 Cal.App.3d 1079, 1089, fn. 8, 218 Cal.Rptr. 725.)
As discussed in Ray , " '[o]ne is privileged to enter or remain on land in the possession of another if it is or reasonably appears to be necessary to prevent serious harm to ... the other or a third person, or the land or chattels of either ....' [Citations.]" ( Ray , supra , 21 Cal.4th at p. 474, 88 Cal.Rptr.2d 1, 981 P.2d 928.) It matters not whether a police officer, a fireman, an ambulance driver, or a social worker responds to the suicide call. As a matter of common sense, it would be anomalous to deny a police officer charged with protecting the citizenry the privilege accorded every other individual who intercedes to aid another or protect another's property. ( Ibid . ) " 'A warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving life and reasonably appears to be necessary for that purpose. [Citations.]' " ( Ibid . )
Pursuant to the community caretaking exception, police officers are expected to check on the welfare of people who cannot care for themselves or *621 need emergency services. ( Ray , supra , 21 Cal.4th at pp. 471-472, 88 Cal.Rptr.2d 1, 981 P.2d 928.) "The policeman, as a jack-of-all-emergencies, has 'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offences'; by default or design he is also expected to 'aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.' If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of crime discovered thereby is admissible in court." (3 LaFave, Search and Seizure (5th ed. 2012) § 5.4(c), pp. 263-264, fns. omitted.)
Appellant contends that the community caretaking rule does not apply to residential searches. Surely a police officer may enter a residence to protect a suicidal person and secure the premises if firearms are believed to be present. (See, e.g., Brigham City v. Utah (2006) 547 U.S. 398, 400, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 [officer may enter home without a warrant to render emergency assistance to an injured *72 occupant or to protect occupant from imminent injury].) The officers had a duty to prevent the possibility that the firearms "would fall into untrained or ... malicious hands." ( Cady v. Dombrowski (1973) 413 U.S. 433, 443, 93 S.Ct. 2523, 37 L.Ed.2d 706.)
When it comes to choosing between the Fourth Amendment protection against warrantless searches and the preservation of life, the preservation of life controls. That was decided more than 50 years ago in Roberts , supra , 47 Cal.2d 374, 303 P.2d 721. There, officers were told that a suspect living in an apartment had missed work and was sickly. ( Id. at p. 378, 303 P.2d 721.) After knocking on the door and receiving no response, the officers heard moans and groans that sounded like a person in distress. ( Ibid . ) The officers believed someone needed emergency assistance, made a warrantless entry, and saw a stolen radio on the kitchen table that resulted in defendant's arrest for second degree burglary. Defendant argued that his Fourth Amendment rights were violated. The officers, however, believed a person in distress was inside the apartment and needed help. ( Id. at pp. 378-379, 303 P.2d 721.) When asked about the moaning sounds, the officers said " 'it could be pigeons, pigeons moan. There are pigeons in the area.' " ( Id. at p. 378, 303 P.2d 721.)
Chief Justice Gibson wrote: "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose. [Citations.]" ( Roberts , supra , 47 Cal.2d at p. 377, 303 P.2d 721.) In the course of conducting a cursory search, officers do "not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered. [Citations.]" ( Id. at p. 379, 303 P.2d 721.)
*622 Similarly, in People v. Payne (1977) 65 Cal.App.3d 679, 135 Cal.Rptr. 480, a reliable informant reported that appellant was molesting children in a garage bedroom. ( Id. at p. 681, 135 Cal.Rptr. 480.) Officers saw a 10 to 12 year old boy enter the garage, were concerned that appellant would harm the boy, forced their way into the garage bedroom, and found a partially dressed boy on a bed in the garage. ( Id. at p. 682, 135 Cal.Rptr. 480.) Citing Roberts , the Court of Appeal held that the victim's " 'right to physical and mental integrity [simply] [outweighed] the right of [appellant] to remain secure in his domestic sanctuary ....' [Citation.]" ( Id. at p. 684, 135 Cal.Rptr. 480.)
The rules and rationale of Ray , Roberts and Payne dictate affirmance here. There, the officers were conducting criminal investigations. Here, they were not. This entry was a pure community caretaking entry and a fortiori, the community caretaking rule applies with more persuasive force.
The community caretaking rule is alive and well. So is appellant because he was saved by the intervention of friends and the police who confiscated his firearms. Principles of stare decisis require that we follow Ray and Roberts . ( Auto Equity Sales , Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.) To say that the officers were required to get a warrant before entering the house and garage would be at variance with common sense and violative of the letter and spirit the "community caretaking" rule. "There is no war between the Constitution and common sense." ( Mapp v. Ohio (1961) 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081.)
*73 Response to Dissent
The dissent's bright line rule unreasonably stifles a police officer's duty to proactively keep the peace for everyone in the community. The presenting situation posed an extreme danger for appellant, his friends, the police, and the neighbors. A literal and mechanical application of the letter of the Fourth Amendment would require the officers to walk away from appellant's doorstep. But the courts must consider the reason for the exclusionary rule. Traditionally, the premise of the exclusionary rule is that it applies only if the police are enforcing the criminal law, i.e., they are entering a residence to search for evidence of crime. That did not happen here.
Here, the officers did not fully comprehend what was confronting them when they entered appellant's residence. Police officers have a healthy skepticism about what they are told in a volatile situation preferring to conduct their own investigation. Here, they wanted to safeguard everyone and they wanted to separate appellant from his firearms. As factually found by the trial court, they were not required to believe that there was no one in the *623 house and that the firearms were secured. Should they be allowed to enter a residence and defuse a "powder keg" waiting to explode when appellant would return to his residence? The answer is "yes." Loaded firearms are inherently dangerous as a matter of law and even though it is constitutionally permissible to possess them in a residence, it is quite another thing to allow them to remain in the possession of a suicidal person. Our holding does not give the police carte blanche to indiscriminately enter a residence on whim or caprice. Where, as here, a defendant threatens to kill himself with a firearm in his house, he is in a poor posture to claim that the police may not enter it to safeguard everyone even if he is coaxed out of the house prior to entry.
The dissent acknowledges that "had" the officers believed appellant was a danger to himself, they could have confiscated his firearms. (Dissent at p. 76) The record does not expressly show that the officers believed this to be the case because no one asked the question. But the inference that they entertained this belief is a reasonable inference. Suicidal persons are a danger to themselves. Every peace officer knows this. The only reason that appellant was not taken to a mental health facility was because, thereafter, probable cause developed for his arrest.
As Justice Gilbert said in his dissent in Unzueta v Ocean View School Dist. (1992) 6 Cal.App.4th 1689, 1705, 8 Cal.Rptr.2d 614 : "A mechanical, literal interpretation of the statute [or here, the Fourth Amendment] in the lifeless atmosphere of a vacuum creates a result contrary to public policy, contrary to legislative intent [or Constitutional intent], contrary to common sense, and contrary to our shared notions of justice." We agree with the trial court that the officers would have been subject to criticism if they had not separated appellant from his firearms.
Disposition
The judgment (order denying motion to suppress) is affirmed.
I concur:
GILBERT, P.J.

This phrase, "cursory search," is coined by Chief Justice Gibson. (See infra , p. 71-72.)

On appeal, the Attorney General concedes that the protective sweep doctrine, which is typically made in conjunction with an in-home arrest, does not apply. (See Maryland v. Buie (1990) 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276.) The Attorney General also conceded at oral argument that under the circumstances here, a search warrant could not issue.