# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

WILLIE OVIEDA,
Defendant and Appellant.

S247235

Second Appellate District, Division Six
B277860

Santa Barbara County Superior Court
1476460

---

August 12, 2019

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Liu, Cuéllar, Kruger, and Groban concurred.

---

PEOPLE v. OVIEDA

S247235

Opinion of the Court by Corrigan, J.

In *People v. Ray* (1999) 21 Cal.4th 464, the lead opinion of this court articulated a "community caretaking" exception to the warrant requirement for government entry into a private residence, suggesting that "circumstances short of a perceived emergency may justify a warrantless entry" into a home. (*Id.* at p. 473 (lead opn. of Brown, J.).) Under United States Supreme Court authority, a warrantless home entry is unreasonable unless it falls within a recognized exception to the warrant requirement, like exigent circumstances, which includes the need to render emergency aid. We conclude that an entry for reasons short of a perceived emergency, or similar exigency, fails to satisfy the relevant constitutional standard. We disapprove the lead opinion in *People v. Ray, supra,* 21 Cal.4th 464 to the extent it conflicts with the views expressed here.

## I. BACKGROUND[1]

On June 17, 2015, officers were dispatched to defendant's home in Santa Barbara after family members reported he was suicidal and had access to a gun. Five officers responded and set up a perimeter. They learned defendant was inside with two friends, Trevor Case and his wife, Amber Woellert.

---

[1]     The facts are taken from the hearing on defendant's suppression motion. (Pen. Code, § 1538.5, subd. (a)(1)(A).)

Defendant's family was not at the scene and his roommate was out of town. Officers were able to contact Case, who came out to speak with them.

Case related that the three had been in defendant's room when defendant began talking about suicide, which he had attempted before. Defendant reached for a pistol near the bed, but Case and Woellert were able to disarm him. Defendant then tried to grab a gun from the bedroom closet and was again restrained. Woellert remained with defendant while Case collected the handgun, two rifles, and ammunition and put them in the garage.

Remaining with the officers, Case called Woellert. She emerged with defendant, who was placed in handcuffs and searched. Case was very emotional and so concerned about defendant that he had alerted defendant's family members, prompting their call to police. Officers Corbett and Bruce entered the home to do a "protective sweep to secure the premises" and make sure there was no one else inside who might be armed, injured, or in need of aid.

Officer Corbett testified that, based on his experience, each situation is different and requires consideration of multiple possible factors, though "safety of persons is paramount." He and Bruce were "unsure if all parties were accounted for," did not have a clear picture of what had caused the situation, and "felt duty bound to secure the premises and make sure there were no people inside that were injured or in need of assistance."

The two officers entered with guns drawn because "[t]here was talk of multiple weapons in the house" and the situation was "emotional and dynamic." They moved slowly

through the house, checking rooms and closets where people in need of help might be found. Corbett had no intent to search for criminal conduct and had "no reason to believe any other criminal activity was afoot."

After entry and during the sweep, Corbett noted "an overwhelmingly strong odor of marijuana" and numerous items related to "marijuana cultivation and concentrated cannabis production." He also saw ammunition, a gun case, scales, and a large industrial drying oven with ducts leading to the garage. On cross-examination, Corbett acknowledged that Case had said the guns had been taken away from defendant and that only he, Woellert, and defendant had been in the house. Case never said that any domestic violence was involved or that anyone else was inside. Corbett had no information that there were any other people in the home.

Officer Garcia also testified and largely confirmed Corbett's testimony. Garcia spoke to Case once he came outside. Case was distraught and tearful during the conversation. Brought outside by Woellert, defendant was searched and handcuffed. He denied being suicidal or having any guns. The on-scene officers collectively decided to conduct a safety sweep. On cross-examination, Garcia conceded that officers had no "specific information that led [them] to believe somebody else was inside." They were told that defendant's roommate was in Washington State. Case did not know if there were other guns in the house beside those he had taken to the garage.

More officers were called to the scene. No search warrant was ever obtained. Ultimately, large quantities of guns, ammunition, and drug-producing equipment were

removed from the house and garage. The recovered weaponry included a submachine gun and a rifle with a long-range scope.

Defendant was charged with manufacturing a controlled substance, importing an assault weapon, and possessing a silencer and short-barreled rifle.[2] He moved to suppress the evidence found in his home. At the suppression hearing, neither officer testified that they had asked defendant's permission to enter to check for others or that they questioned the veracity of Case and Woellert. They mentioned no noise or movement in the house or garage creating concern that others might be inside or that anything was amiss there. They were not asked what, if anything, they intended to do with defendant or whether he would have been allowed to return to the residence. They did not rely on that possibility to justify the need for the protective sweep. The prosecution based its case on the community caretaking exception, not on exigent circumstances. The court denied the motion. It accepted the officers' testimony regarding "what they knew, what they were concerned about and what they didn't know." The court reasoned the officers were not required to accept Case's word that he had removed the firearms and noted they would be "subject to criticism" if something untoward had occurred because they did not conduct a sweep for others who might pose a danger or need assistance.

After pleading guilty to the manufacturing count and to possession of an assault weapon,[3] defendant was placed on

---

[2] See Health and Safety Code section 11379.6, subdivision (a); Penal Code sections 30600, subdivision (a), 33410, 33210.

[3] Penal Code section 30605, subdivision (a).

probation. A divided Court of Appeal upheld the search under the community caretaking exception. (*People v. Ovieda* (2018) 19 Cal.App.5th 614, 619-623, review granted Apr. 25, 2018, S247235.)

## II. DISCUSSION

### A. *The Warrant Requirement and the Exigent Circumstances Exception*

Both the federal and state Constitutions prohibit unreasonable searches and seizures. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.) "In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." (*People v. Troyer* (2011) 51 Cal.4th 599, 605 (*Troyer*).) " '[T]he ultimate touchstone of the Fourth Amendment is "reasonableness." ' " (*Riley v. California* (2014) 573 U.S. 373, 381; *People v. Macabeo* (2016) 1 Cal.5th 1206, 1213.) "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Payton v. New York* (1980) 445 U.S. 573, 585 (*Payton*); see *People v. Schmitz* (2012) 55 Cal.4th 909, 919.) "[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 390 (*Mincey*); see *Riley*, at p. 382.) "The burden is on the People to establish an exception applies." (*Macabeo*, at p. 1213.) " ' " 'We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or

seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " ' " (*Id*. at p. 1212.)

" 'A long-recognized exception to the warrant requirement exists when "exigent circumstances" make necessary the conduct of a warrantless search.' " (*People v. Panah* (2005) 35 Cal.4th 395, 465.) The term "exigent circumstances" describes " ' "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." ' " (*Ibid*.) The high court has recognized that exigent circumstances may exist where there is probable cause to believe a crime has been committed but "an emergency leaves police insufficient time to seek a warrant." (*Birchfield v. North Dakota* (2016) __ U.S. __, __ [136 S.Ct. 2160, 2173].) It has also found exigency when an entry or search appears reasonably necessary to render emergency aid, whether or not a crime might be involved. "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. . . . 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [Citation.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." (*Mincey, supra,* 437 U.S. at pp. 392-393, fns. omitted.) "Accordingly, law

6

enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403 (*Brigham City*).)

Thus, the exigent circumstances exception applies to situations requiring prompt police action. These situations may arise when officers are responding to or investigating criminal activity and when there is a need for emergency aid, even if unrelated to criminal conduct. Examples of exigent circumstances in prior cases include " 'hot pursuit' " of a fleeing suspect (*United States v. Santana* (1976) 427 U.S. 38, 42-43); preventing the imminent destruction of evidence (see *Kentucky v. King* (2011) 563 U.S. 452, 460); fighting a fire (*Michigan v. Tyler* (1978) 436 U.S. 499, 509); intervening in a physical altercation or crime in progress, or providing emergency help (see *Brigham City, supra,* 547 U.S. at pp. 406-407; see also *Michigan v. Fisher* (2009) 558 U.S. 45, 48-49). Lower federal courts have also recognized that a warrantless entry in response to an actively suicidal person may be justified to prevent injury. "[T]he threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment." (*Rice v. ReliaStar Life Ins. Co.* (5th Cir. 2014) 770 F.3d 1122, 1131; see also *Fitzgerald v. Santoro* (7th Cir. 2013) 707 F.3d 725, 732; *Roberts v. Spielman* (11th Cir. 2011) 643 F.3d 899, 905-906; *Hancock v. Dodson* (6th Cir. 1992) 958 F.2d 1367, 1375-1376.)

If the officers here were lawfully inside defendant's home, they could seize contraband in plain sight. (See *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 464-465 (*Coolidge*); see also *Minnesota v. Dickerson* (1993) 508 U.S.

366, 375.) They could also rely on what they had seen to secure a warrant to conduct a more extensive search. (See *Michigan v. Clifford* (1984) 464 U.S. 287, 294 (*Clifford*).) This case turns on whether the initial entry of Officers Corbett and Bruce was lawful.

This case does not fall into any recognized scenario describing exigent circumstances, and the Attorney General does not argue otherwise.[4] Nor does the Attorney General rely on the need for a "protective sweep." While it was undisputed that defendant was suicidal when officers arrived at his home, he subsequently came outside and was restrained. The officers cited concerns that unknown persons might be in the house, and that there may have been victims or loaded firearms inside. While these concerns are obviously important, the People elicited no testimony to show the officers reasonably believed they were actually in play.

" 'As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citation.] And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or "hunches," but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' " (*People v. Duncan* (1986) 42 Cal.3d 91, 97-98 (*Duncan*).)

---

[4] The People took the same position in the Court of Appeal.

Here, the officers pointed to no such facts. If they existed, the prosecution failed to elicit them. Indeed, the facts in the record point to the contrary. The officers responded to a dispatch that defendant was suicidal. Case, defendant's friend, told officers that he, his wife, and defendant were the only people in the house and that defendant had been disarmed. All three were outside before the officers entered. Although officers were not required to take Case at his word, the only immediate danger reported was that defendant might harm himself. But, before the entry, defendant was in handcuffs and under police control. There were no reports that shots had been fired, that defendant had threatened anyone else, or that there were any victims inside the house. (Compare with *Tamborino v. Superior Court* (1986) 41 Cal.3d 919, 922-924; *People v. Stamper* (1980) 106 Cal.App.3d 301, 304-306 (*Stamper*).) The officers mentioned no sounds or possible movement in the house or any suspicious behavior by defendant or his friends during the initial interaction. Further, possession of legal firearms in a home is generally lawful (see *District of Columbia v. Heller* (2008) 554 U.S. 570, 576-635), and their presence in an apparently empty home does not, without more, constitute exigent circumstances. There was no indication that firearms were accessible to others or that they posed a threat to officers or the public. The People cite no authority, and we have found none, where an exigency was found to exist based on facts similar to those here.

B. *Community Caretaking*

Even in the absence of exigency, both the trial court and the Court of Appeal majority concluded the warrantless entry here was justified under the so-called "community caretaking" exception. We begin our discussion with *People v. Ray, supra,*

21 Cal.4th 464 (*Ray*), where the lead opinion of this court recognized a *nonemergency* community caretaking exception permitting residential entry. For the reasons discussed below, we conclude no such exception exists and that the *Ray* lead opinion was wrong to create one. As we discuss in further detail, the United States Supreme Court has articulated the concept of community caretaking, but only in the context of vehicle searches.

### 1. Ray

In *Ray*, someone called police and reported that a neighbor's front door " 'has been open all day and it's all a shambles inside.' " (*Ray, supra,* 21 Cal.4th at p. 468 (lead opn. of Brown, J.).) Officers responded and confirmed that the door was open and " 'the front room appeared to be ransacked as if someone went through it.' " (*Ibid.*) Officers knocked and announced their presence but received no reply. They then entered "to conduct a security check 'to see if anyone inside might be injured, disabled, or unable to obtain help.' " (*Ibid.*) The house was empty, but officers found drugs and cash in plain view. They left and obtained a search warrant. (*Id.* at pp. 468-469.)

The lead opinion garnered three votes to amplify the community caretaking exception. It drew a distinction between exigent circumstances and community caretaking. An exigent circumstances analysis is appropriate, it said, when officers " 'are searching for evidence or perpetrators of a crime.' " (*Ray, supra,* 21 Cal.4th at p. 471 (lead opn. of Brown, J.).) For the exception to apply, officers must (1) have probable cause for a search or seizure; and (2) show that, because of the circumstances, there is no time to obtain a warrant. (*Ibid.*)

The community caretaking exception, the lead opinion maintained, applies when officers are not involved in crime solving, but are, instead, providing some kind of aid unrelated to criminal investigation. (*Ibid*.)

The lead opinion then asserted that the community caretaking exception arises in two situations: entry to render emergency aid and entry to preserve life or property. While conceptually these situations seem to substantially overlap, the lead opinion analyzed them under different standards. When relying on the need to render *emergency aid*, the People must demonstrate "specific, articulable facts indicating the need for ' "swift action to prevent imminent danger to life or serious damage to property." ' " (*Ray, supra,* 21 Cal.4th at p. 472 (lead opn. of Brown, J.).) The lead opinion concluded the People *failed* to do so on the record before it. Accordingly, it rejected reliance on the need to render emergency aid. (*Id*. at p. 473.)

However, the lead opinion held that a different facet of community caretaking, requiring a less stringent showing, could justify the entry. It pronounced: "Under the community caretaking exception, circumstances *short of a perceived emergency* may justify a warrantless entry, including the protection of property, as 'where the police reasonably believe that the premises have recently been or are being burglarized.' " (*Ray, supra,* 21 Cal.4th at p. 473 (lead opn. of Brown, J.), italics added.) According to the lead opinion, under the less demanding aspect of the community caretaking exception, the question is: "Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions?" (*Id*. at p. 477.)

The lead opinion concluded, "The facts before us precisely illustrate one facet of law enforcement's community caretaking functions." (*Ray, supra,* 21 Cal.4th at p. 478 (lead opn. of Brown, J.).) It reasoned that "[w]hile the facts known to the officers may not have established exigent circumstances or the apparent need to render emergency aid, they warranted further inquiry to resolve the possibility someone inside required assistance or property needed protection. In such circumstances, 'entering the premises was the only practical means of determining whether there was anyone inside in need of assistance [or property in need of protection].' " (*Ibid.*)

As noted, the lead opinion did not garner a majority. Neither its holding nor its reasoning constitutes binding precedent. A separate three-justice concurrence agreed in the result that the entry was proper. It did not embrace the lead opinion's lesser community caretaking rationale. Instead, it urged that, under an exigency analysis, entry was permitted. " 'We have defined "exigent circumstances" to include "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property. . . ." [Citation.] The action must be "prompted by the motive of preserving life or property and [must] reasonably appear[] to the actor to be necessary for that purpose." ' " (*Ray, supra,* 21 Cal.4th at p. 481 (conc. opn. of George, C. J.), quoting *Duncan, supra,* 42 Cal.3d at p. 97.) The concurring justices determined that the facts in *Ray* supported a warrantless entry without the need to expand available warrant exceptions. "Exigent circumstances existed, because the officers had reasonable cause to believe a burglary was in progress, or that a burglary had been committed and there might be persons inside the

residence in need of assistance." (*Ray*, at p. 482 (conc. opn. of George, C. J.).)

The lone dissent "firmly reject[ed] the suggestion that we should create a broad new exception to the Fourth Amendment protection against warrantless searches, permitting police officers to enter a residence, even when there is no immediate threat to its occupants, merely as part of their 'community caretaking functions.' Such an exception threatens to swallow the rule that absent a showing of true necessity, the constitutionally guaranteed right to security and privacy in one's home must prevail. I strongly disagree with the assumption that the warrantless search of a residence, under nonexigent circumstances, can be justified on the paternalistic premise that 'We're from the government and we're here to help you.'" (*Ray, supra,* 21 Cal.4th at p. 482 (dis. opn. of Mosk, J.).) The dissent concluded that "[t]he circumstances did not warrant a reasonable belief that entry was necessary to preserve life or property. To the extent that the officers believed they were called upon to perform a community caretaking function, it would have sufficed to shut the door." (*Id.* at p. 487.)

### 2. Roberts, Hill, *and California Authorities*

In recognizing a community caretaking exception, the lead opinion discerned support in *People v. Roberts* (1956) 47 Cal.2d 374 (*Roberts*) and *People v. Hill* (1974) 12 Cal.3d 731 (*Hill*). (See *Ray, supra,* 21 Cal.4th at pp. 473-474 (lead opn. of Brown, J.).) In *Roberts*, a car potentially involved in a commercial burglary was registered to a woman living in a San Francisco apartment. The apartment manager told officers that the defendant "also lived in the same apartment and that

he had not worked often and was sickly." (*Roberts*, at p. 376.) Officers knocked on the door and received no response but "heard several moans or groans that sounded as if a person in the apartment [was] in distress, and the manager let them into the apartment at their request." (*Ibid*.) Officers found no one but discovered a radio stolen in the burglary. Based on this observation, they obtained a search warrant.

*Roberts* upheld the entry. The court initially noted the trial judge "found that the officers reasonably believed that someone inside the apartment was in distress and in need of assistance and that they entered for the purpose of giving aid." (*Roberts, supra,* 47 Cal.2d at p. 377.) While cautioning that "[t]he privilege to enter to render aid does not, of course, justify a search of the premises for some other purpose" (*id*. at p. 378), the *Roberts* court held that, once inside, police could seize stolen items in plain view, reasoning: "The trial court found on substantial evidence that the entry was lawful for the purpose of rendering aid, hence the officers were justified in entering each room of the apartment to look for someone in distress. The radio was in plain sight, and it fitted the general description of property known by the officers to be stolen. Under the circumstances, there appears to be no reason in law or common sense why one of the officers could not pick up the radio and examine it for the purpose of dispelling or confirming his suspicions." (*Id*. at p. 380.) Plain view observations made from a position in which officers otherwise have a right to be do not "constitute a search." (*Ker v. California* (1963) 374 U.S. 23, 43.)

In *Hill*, two men arrived at a house to buy drugs. Inside, they were accosted by two assailants. One of the two men was shot and taken by a witness to a hospital where he died. The

assailants fled. (*Hill, supra,* 12 Cal.3d at p. 740.) Officers were sent to the scene and received no response when they announced their presence. They entered the house and found evidence related to the shooting in plain view. Although rejecting the claim that the entry was justified by "the 'hot pursuit' doctrine," *Hill* upheld the search because "the circumstances were sufficiently 'exigent' so as to justify an immediate entry and search of the premises," relying on *Roberts*. (*Id*. at p. 754.) *Hill* reasoned: "[W]e note that immediately after the police learned of the shooting on Juanita Street officers were dispatched to investigate. They knew only that a shooting had very recently occurred and that one person suffering from serious wounds had been brought to a hospital. The officers found fresh bloodstains on the fence and porch of the Juanita Street murder site and on an automobile parked outside. They also observed through a porch window what appeared to be bloodstains on the floor inside the house. Although only one casualty had thus far been reported, others may have been injured and may have been abandoned on the premises. There was no response when the officers knocked and announced themselves, and entering the premises was the only practical means of determining whether there was anyone inside in need of assistance. If there was, the delay incidental to obtaining a search warrant could have resulted in the unnecessary loss of life. Under the circumstances it was reasonable for the officers to believe that the shooting may have resulted in other casualties in addition to that reported to the police and that an immediate entry was necessary to render aid to anyone in distress. The People, therefore, have borne their burden of demonstrating the existence of

circumstances which justify the warrantless entry of the Juanita Street residence." (*Id.* at p. 755.)

The line between a mere hunch and a reasonable suspicion based on articulable facts can be a fine one, but such a line does exist. If all that is required is the possibility that someone in some house might require aid, any officer on patrol might urge that people in homes often need help and the officer entered to make sure assistance was not required. As Justice Perren observed in his dissent below: "Ignorance of a fact, without more, does not raise a suspicion of its existence." (*People v. Ovieda, supra,* 19 Cal.App.5th at p. 629 (dis. opn. of Perren, J.), review granted.) *Roberts* and *Hill* are examples of the kind of articulable facts that can support a reasonable suspicion of the need to enter to deal with an emergency.

The *Ray* lead opinion failed to acknowledge that, while *Roberts* and *Hill* did involve entries to render potential aid, they both involved emergency situations based on articulable facts. Neither case suggested that warrantless entry to render *nonemergency* aid would be justified. As the *Roberts* court observed, "*Necessity* often justifies an action which would otherwise constitute a trespass, as where the act is [undertaken to preserve] life or property and reasonably appears to the actor to be *necessary* for that purpose." (*Roberts, supra,* 47 Cal.2d at p. 377, italics added.) Similarly, *Hill* concluded an exigency existed "and that an immediate entry was *necessary* to render aid to anyone in distress." (*Hill, supra,* 12 Cal.3d at p. 755, italics added.) The presence of necessity emphasized by both cases is incompatible with the nonemergency entry condoned by the *Ray* lead opinion. (See *Horack v. Superior Court* (1970) 3 Cal.3d 720, 726; *People v. Soldoff* (1980) 112 Cal.App.3d 1, 7.)

16

Aside from the Court of Appeal below, no published California case after *Ray* has applied the concept of community caretaking outside the context of a vehicle inventory. At least two cases have concluded that no substantial evidence existed to support a community caretaking search. *People v. Madrid* (2008) 168 Cal.App.4th 1050 held the doctrine did not justify a traffic stop where police believed a passenger may have been ill. (*Id*. at pp. 1057-1060.) *People v. Morton* (2003) 114 Cal.App.4th 1039 held the belief that there had been a " 'marijuana rip off' " at a residence was unsupported by substantial evidence and a warrantless entry was not excused. (*Id*. at pp. 1048-1049; see also *People v. Camacho* (2000) 23 Cal.4th 824, 837, fn. 4.)

The need to render emergency aid is a well-recognized part of the exigent circumstances exception. But it has always required that articulable facts support a reasonable belief that an emergency exists. The *Ray* lead opinion, having found no such facts were established, created a less demanding exception. It purported to permit a warrantless entry if some kind of police assistance might be rendered but the need was merely hypothetical.

The *Ray* lead opinion's diluted exception was not supported by our prior jurisprudence. The circumstances it describes as community caretaking do not involve nonemergency situations at all. Rather, it describes situations that *could* be emergencies but lack sufficient articulable facts to reasonably suggest an emergency exists. It suggested that entry was justified "to resolve the *possibility* someone inside required assistance or property needed protection." (*Ray, supra,* 21 Cal.4th at p. 478 (lead opn. of Brown, J.), italics added.) If officers had articulated facts to believe someone

inside needed immediate aid or that a crime was ongoing, they could enter based on those exigent circumstances. The lead opinion's suggestion that an entry is justified to explore the *possibility* that those facts exist dilutes the appropriate standard for exigency. Indeed, such a suggestion is inconsistent with our later clarification in *Troyer, supra,* 51 Cal.4th 599 that, although police do not "need 'ironclad proof of "a likely serious, life-threatening" injury to invoke the emergency aid exception,'" (*id.* at p. 602), officers must possess "an objectively reasonable basis for believing that an occupant was seriously injured or threatened with such injury" (*id.* at p. 607). The line falls between the mere inchoate possibility that an emergency *could* exist and the officer's articulation of facts that make it reasonable, even if uncertain, to believe an emergency *does* exist.

The officers here surmised that there may have been others in the house who required aid or posed a threat if allowed access to unsecured firearms. Those could be exigent circumstances justifying warrantless entry, but the objective facts that elevate speculation to reasonable suspicion were not present or were not articulated at the suppression hearing. (Cf. *Troyer, supra,* 51 Cal.4th at p. 607; *People v. Pou* (2017) 11 Cal.App.5th 143, 151-152; *Stamper, supra,* 106 Cal.App.3d at pp. 305-306.)

Further, even though the officers here could not articulate facts pointing to an emergency, they were not without recourse. If officers reasonably believed that defendant was a danger to himself or others due to a mental disorder, they could have temporarily taken him into custody for a mental health evaluation. (Welf. & Inst. Code, §§ 5150, subd. (a), 5260; see *People v. Triplett* (1983) 144 Cal.App.3d

283, 286-288.) If they had done so, they could have obtained a warrant for the seizure of defendant's firearms. (Pen. Code, § 1524, subd. (a)(10); Welf. & Inst. Code, § 8102, subd. (a).)

### 3. *United States Supreme Court Precedent*

Scant high court precedent supports *Ray*'s lead opinion. Indeed, the United States Supreme Court has never applied the concept of a community caretaking search outside the context of an automobile inventory. In *Cady v. Dombrowski* (1973) 413 U.S. 433 (*Cady*), Dombrowski was an off-duty policeman involved in a single-car accident. He was arrested for drunk driving and taken to a hospital, while his car was towed to a local garage. Dombrowski was required to carry his service revolver at all times but did not have it with him when arrested.[5] An officer who went to the garage to search for the gun saw blood and other evidence in the car that linked Dombrowski to a murder. (*Cady*, at pp. 435-439.)

In upholding the search, *Cady* took great pains to distinguish between home and vehicle searches. "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. . . . Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no

---

[5] Dombrowski was a Chicago police officer and "[t]he Wisconsin policemen believed that Chicago police officers were required by regulation to carry their service revolvers at all times." (*Cady, supra,* 413 U.S. at p. 436.)

claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (*Cady, supra,* 413 U.S. at p. 441.) The court observed, "The constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." (*Id*. at p. 442.) *Cady* emphasized that "police had exercised a form of custody or control over" the car (*id*. at pp. 442-443), and "the search of the trunk to retrieve the revolver was 'standard procedure in [that police] department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands" (*id*. at p. 443).

*Cady* concluded the search was reasonable under the circumstances: "The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking 'search' conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained. . . . Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments." (*Cady, supra,* 413 U.S. at pp. 447-448.) The high court later applied *Cady*'s reasoning to uphold inventory searches of

impounded cars and containers in them. (See *Colorado v. Bertine* (1987) 479 U.S. 367, 374-376 (*Bertine*); *South Dakota v. Opperman* (1976) 428 U.S. 364, 367-376 (*Opperman*); see also *Cooper v. California* (1967) 386 U.S. 58, 60-62.)

*Cady* and its progeny did not create a generalized exception to the warrant requirement for nonemergency community caretaking functions, much less apply such an exception to the search of homes. *Cady* did not suggest that a community caretaking rationale alone could justify the search there. Instead, the court emphasized that police had taken constructive possession of the car in question and searched it pursuant to a standardized procedure. (*Cady, supra,* 413 U.S. at pp. 442-443.) *Cady* and the other cases all involved searches of vehicles in police custody. The caretaking function entailed only the securing of items in those vehicles.

None of the rationales justifying the results in *Cady* and subsequent cases apply here. This search involved a home, "where privacy expectations are most heightened." (*California v. Ciraolo* (1986) 476 U.S. 207, 213.) The Fourth Amendment "reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference," and "the Court since the enactment of the Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" (*Oliver v. United States* (1984) 466 U.S. 170, 178.) The court has repeatedly acknowledged that vehicles and homes are afforded different levels of constitutional protection. (See *Bertine, supra,* 479 U.S. at p. 372; *Opperman, supra,* 428 U.S. at p. 367; *Cady, supra,* 413 U.S. at p. 442; see also *Chambers v. Maroney* (1970) 399 U.S. 42, 48; *Carroll v. United States* (1925) 267 U.S. 132, 153.)

Outside of the inventory search context, the high court has taken a dim view of warrantless entries in the absence of exigency. In *Mincey*, the court rejected a blanket murder scene exception to the warrant requirement. It acknowledged that "when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." (*Mincey, supra,* 437 U.S. at p. 392.) Yet, *Mincey* reasoned that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation,' [citation] and it simply cannot be contended that this search was justified by any emergency threatening life or limb. All the persons in Mincey's apartment had been located before the investigating homicide officers arrived there and began their search. And a four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search." (*Id.* at p. 393; see *Flippo v. West Virginia* (1999) 528 U.S. 11, 14.) Similarly, the court has observed that "[a] burning building of course creates an exigency that justifies a warrantless entry by fire officials to fight the blaze. Moreover, . . . once in the building, officials need no warrant to *remain* for 'a reasonable time to investigate the cause of a blaze after it has been extinguished.' [Citation.] Where, however, reasonable expectations of privacy remain in the fire-damaged property, additional investigations begun after the fire has been extinguished and fire and police officials have left the scene, generally must be made pursuant to a warrant or the identification of some new exigency." (*Clifford, supra,* 464 U.S. at p. 293, fn. omitted.)

These cases establish that an emergency might initially justify a warrantless entry or search. But once that exigency

has abated and the premises vacated, a subsequent warrantless entry or search is not justified. This approach is consistent with the high court's well-established principle "that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined 'exigent circumstances.' " (*Coolidge, supra,* 403 U.S. at pp. 477-478.) In *Payton, supra,* 445 U.S. 573, the court noted: "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." (*Id.* at p. 590.) High court decisions "have emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated,' [citation] and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions . . . ." (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 749-750.)

The Attorney General urges at length that the officers here were not motivated by a desire to investigate crime but, rather, to ensure public safety or render aid to potential victims. However, the United States Supreme Court has made clear that an officer's subjective intent plays no role in the Fourth Amendment inquiry. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' [Citation.] The officer's subjective motivation is irrelevant." (*Brigham City, supra,* 547 U.S. at p. 404; see also *Whren v. United States* (1996) 517 U.S. 806, 813.) The officers here may well have acted with the very best of

intentions. But just as an officer's venial motives will generally not undermine an otherwise valid search, a benign intent cannot save an invalid one.

The Attorney General likens the present search to a home safety inspection and relies on *Camara v. Municipal Court* (1967) 387 U.S. 523. The argument falters at the threshold. Unlike *Camara*, the entry and search here were not "routine periodic inspections" (*id.* at pp. 535-536), nor did they "have a long history of judicial and public acceptance" because "the public interest demands that all dangerous conditions be prevented or abated" (*id.* at p. 537). Administrative safety inspections and similar entries are quite different from an entry by police officers with guns drawn. Further, even *Camara* required a warrant be secured if a person refused the inspectors access, unless a prompt entry was required by an emergency situation. (*Id.* at pp. 538-540.) *Camara* neither supports the Attorney General's argument nor the reasoning of the *Ray* lead opinion.

In sum, the community caretaking exception asserted in the absence of exigency is not one of the carefully delineated exceptions to the residential warrant requirement recognized by the United States Supreme Court. To date, that court has only recognized community caretaking searches in the context of vehicle impound procedures.

## III.  DISPOSITION

The Court of Appeal's judgment is reversed.  The matter is remanded with directions that the case be returned to the trial court to permit defendant to withdraw his guilty plea and the court enter an order granting defendant's suppression motion.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Ovieda
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 19 Cal.App.5th 614
**Rehearing Granted**

_____

**Opinion No.** S247235
**Date Filed:** August 12, 2019
_____

**Court:** Superior
**County:** Santa Barbara
**Judge:** Jean M. Dandona

_____

**Counsel:**

Elizabeth K. Horowitz, under appointment by the Supreme Court, for Defendant and Appellant.

Peter Bibring and Ian M. Kysel for American Civil Liberties Union Foundation of Southern California as Amicus Curiae on behalf of Defendant and Appellant.

Xavier Becerra, Attorney General, Edward C. DuMont, State Solicitor General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael J. Mongan, Deputy State Solicitor General, Kenneth C. Byrne, Andrew S. Pruitt and David Glassman, Deputy Attorneys General, and Geoffrey H. Wright, Associate Deputy State Solicitor General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elizabeth K. Horowitz
Law Office of Elizabeth K. Horowitz, Inc.
5272 South Lewis Avenue, Suite 256
Tulsa, OK 74105
(424) 543-4710

Ian M. Kyse
ACLU Foundation of Southern California
1313 West Eight Street
Los Angeles, CA  90017
(213) 977-5295

Geoffrey H. Wright
Associate Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3921