Filed 4/8/22  P. v. Stewart CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C092676 |
| Plaintiff and Respondent, | (Super. Ct. No. 17F1876) |
| v. | |
| STEVAN DRE STEWART, | |
| Defendant and Appellant. | |

Responding to a report of a structure fire, police and fire department personnel arrived at defendant Stevan Dre Stewart's apartment.  The apartment was filled with smoke and a fire alarm was sounding.  Firefighters found defendant, who was on probation at the time, and his girlfriend unconscious in bed and escorted them out.  Defendant, who seemed a bit "out of it," walked around outside, followed by police Sergeant Jeffrey Schmidt.  While the fire department was still working in the apartment, defendant attempted to go back inside.  Schmidt grabbed defendant by the arm to stop him from reentering the apartment, and defendant spun around and raised his arms in what Schmidt deemed to be an aggressive posture.  Schmidt took defendant to the ground and police subdued him.  The People filed a petition for violation of probation, alleging

1

two counts of resisting, delaying, or obstructing an officer. The trial court sustained the petition as to one count. On appeal, defendant asserts substantial evidence does not support the trial court's determination and that, in the absence of sufficient evidence, that determination violated due process. We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

In 2017, defendant pleaded no contest to felony violation of Penal Code section 273.5 (statutory section citations that follow are to the Penal Code), infliction of corporal injury on a spouse or cohabitant. On May 17, 2017, the trial court suspended imposition of sentence and imposed formal probation. A condition of defendant's probation was that he violate no laws. On January 17, 2020, the People filed a petition for revocation of probation, asserting that, on October 26, 2019, defendant committed two counts of resisting, delaying, or obstructing an officer in violation of section 148, subdivision (a)(1).

### *The People's Case*

At approximately 3:12 a.m. on October 26, 2019, Sergeant Schmidt and Officer Lauren Meyer were both in uniform and both in marked patrol vehicles when they responded to reports of a structure fire. When they arrived at the location, Schmidt and Meyer both saw an apartment with smoke inside and Meyer heard a fire alarm. They began pounding on the apartment door.

When they arrived, firefighters forced entry into the apartment. They went in, came out, and reported that the smoke was from a stove or oven fire, and there was only smoke inside the apartment. Firefighters went back in to see if anyone was inside. Fire Captain Steve Cramer found a male and a female sleeping in the bedroom who did not respond to verbal commands.

Firefighters brought defendant and the female out of the apartment. Captain Cramer testified the male he escorted out did not appear to understand what was

2

happening, and Cramer informed law enforcement the male appeared to be "out of it."

He pushed Cramer away. Officer Meyer noted defendant was "being very aggressive with the firefighter that was escorting him out." Defendant "was aggressively pulling away from the firefighter and he took kind of like a fighting stance, he faced the firefighter. It was aggressive." According to Sergeant Schmidt, defendant was resisting as he was being led out of the apartment, but he "also seemed like he was not completely coherent at the time."

Officer Meyer got the female seated on a curb and turned her attention to defendant. Meyer talked to defendant and tried to calm him down and get him to sit down. Defendant was not very responsive and was in a daze.

Sergeant Schmidt followed defendant as he walked around to keep an eye on him. Schmidt was concerned for defendant because he had just come out of a smoke-filled apartment. Schmidt tried to direct defendant towards an ambulance to be seen by medical staff. Defendant did not acknowledge what Schmidt was saying. Every now and then, defendant would look at Schmidt and scowl, "not in an aggressive manner but almost like what are you doing, like, who are you."

After defendant walked around a bit, he turned and started walking back toward the apartment. Officer Meyer did not want defendant going back into the apartment both because of the smoke and based on defendant's aggression towards one of the firefighters. Sergeant Schmidt stopped defendant from going inside and told defendant, "we're not going back in. You need to come over and talk to the ambulance crew." Schmidt said, "we're not going in or you can't go into the apartment or something to that effect." Schmidt told defendant that going into the apartment was not an option, or that "we were staying out of the apartment." Schmidt could not remember the exact words he used. At least one time, Schmidt told defendant, "you can't go into the apartment."

Sergeant Schmidt testified: "That's why when I grabbed him by his arm, I'm trying to, like, guide him, like, hey, let's—I hate to say like when you got a drunk friend,

3

and they're wandering the wrong way and you grab 'em and you try to turn them in the way they need to go. But that's kind of what I was trying to do is, like, hey, let's go back over here . . . ." After Schmidt grabbed defendant's arm, defendant pulled away from Schmidt really hard. Defendant "rip[ped]" away from Schmidt and put his arms up. Defendant spun around, faced Schmidt, and raised his arms, "like we're going to fight right there in . . . the entryway." They were "looking straight at each other." According to Officer Meyer, defendant turned around "very aggressively" to face Schmidt, and "it looked like . . . [defendant] was going to assault . . . Schmidt." Schmidt "felt like there was something coming at me, some sort of an attack . . . . So we had to stop him and get him into handcuffs, get him over to the ambulance for treatment and . . . mitigate that risk to me, to the other officers, to the fire department . . . , so fire could accomplish their mission to deal with whatever the fire was."

Sergeant Schmidt grabbed defendant and took him to the ground. Officer Meyer attempted to handcuff defendant but he kept his arms under his body. Defendant refused to move his hands out from under his body, so the officers "started using different techniques to try to gain compliance," including knee strikes and palm strikes. Schmidt also used a baton and pepper spray. At some point, a firefighter tried to help subdue defendant. Eventually, the officers handcuffed defendant.

## *The Defense Case*

Defendant's upstairs neighbor testified his wife had called the fire department. The neighbor later went outside and saw defendant on the ground. Officers had defendant's face pressed up against a bed frame that was on the ground and had his arm twisted behind his back. Defendant was saying, " 'Please stop, you're hurting me. Please stop.' "

Defendant testified he and his girlfriend had gone to a party. He had drinks before going to the party and more drinks at the party. They went home after 2:00 a.m. When

4

they got home, defendant began to cook some hot links on the stove. However, he then lay down in bed next to his girlfriend and fell asleep. Later, defendant woke up in jail, confused. He did recall a few snippets, "like a glimpse of me . . . looking at my door. And I remember me being on the ground." Defendant remembered "being on the ground and saying, 'Ow, ow . . . what are you doing?' Like I was . . . screaming for help. And that's all I really remember from . . . the incident." When he woke up in the holding cell, he had injuries and his face felt like it was burning from the pepper spray.

*The Trial Court's Decision*

The trial court divided the incident into two discrete time frames, one consisting of the events from when defendant was removed from his apartment until Sergeant Schmidt took him to the ground and the other consisting of everything thereafter. The court sustained the allegation of one violation of section 148, subdivision (a)(1) related to the first time frame and did not sustain the second. With regard to the first time frame, the trial court stated that the "threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment." The court concluded it was reasonable for law enforcement to prevent defendant from entering his apartment because of the smoky conditions in the apartment. From the perspective of law enforcement, defendant was not in a position to care for himself, whether because of alcohol or smoke inhalation. While outside, defendant had demonstrated he was not responsive to verbal direction. Therefore, when he began to walk towards his apartment, it was reasonable for Sergeant Schmidt to grab defendant and physically redirect him. When this happened, defendant became aggressive. The court continued: "[O]n more than one occasion, he certainly turned and resisted the lawful redirection of Sergeant Schmidt . . . ." Having sustained one of two counts, the trial court revoked and reinstated probation and extended the probation term to November 16, 2020.

DISCUSSION

*Substantial Evidence Supports the Trial Court's Order*

Defendant asserts substantial evidence does not support the trial court's conclusion that he willfully resisted, obstructed, or delayed Sergeant Schmidt in the discharge of his duties. Defendant asserts that, in the absence of sufficient evidence, the trial court's finding violated his right to due process.

"Section 1203.2, subdivision (a), authorizes a court to revoke probation if the interests of justice so require and the court, in its judgment, has reason to believe that the person has violated any of the conditions of his or her probation. [Citation.] ' "When the evidence shows that a defendant has not complied with the terms of probation, the order of probation may be revoked at any time during the probationary period. [Citations.]" [Citation.]' [Citation.] The standard of proof in a probation revocation proceeding is proof by a preponderance of the evidence. [Citations.] 'Probation revocation proceedings are not a part of a criminal prosecution, and the trial court has broad discretion in determining whether the probationer has violated probation.' " (*People v. Urke* (2011) 197 Cal.App.4th 766, 772, fn. omitted (*Urke*).)

"We review a probation revocation decision pursuant to the substantial evidence standard of review [citation], and great deference is accorded the trial court's decision, bearing in mind that '[p]robation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court.' " (*Urke, supra*, 197 Cal.App.4th at p. 773.) " 'When considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could

6

infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).)

" 'The discretion of the court to revoke probation is analogous to its power to grant the probation, and the court's discretion will not be disturbed in the absence of a showing of abusive or arbitrary action. [Citations.]' [Citation.] 'Many times circumstances not warranting a conviction may fully justify a court in revoking probation granted on a prior offense. [Citation.]' [Citation.] ' "[O]nly in a very extreme case should an appellate court interfere with the discretion of the trial court in the matter of denying or revoking probation. . . ." ' [Citation.] And the burden of demonstrating an abuse of the trial court's discretion rests squarely on the defendant." (*Urke, supra*, 197 Cal.App.4th at p. 773.)

*Willfulness*

"Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed," is guilty of a misdemeanor. (§ 148, subd. (a)(1).) The elements of a violation of section 148, subdivision (a)(1) are: " '(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties.' " (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329.)

Upon being escorted out of his apartment by firefighters, defendant pushed Captain Cramer away. According to Officer Meyer, defendant was being very aggressive

7

with the firefighter who was escorting him out of the apartment, even assuming "kind of like a fighting stance." Sergeant Schmidt testified defendant was resisting as he was being led out of the apartment. After defendant walked around a bit, he started walking back toward his apartment. Schmidt stopped defendant from going inside and told defendant, "we're not going back in. You need to come over and talk to the ambulance crew." Schmidt said, "we're not going in or you can't go into the apartment or something to that effect."

At least once, Schmidt told defendant, "you can't go into the apartment." Defendant did not acknowledge what Schmidt was saying. Every now and then, however, defendant would look at Schmidt and scowl, "not in an aggressive manner but almost like what are you doing, like, who are you." Schmidt grabbed defendant's arm and defendant pulled away really hard. Defendant "rip[ped]" away from Schmidt and put his arms up. Defendant spun around, faced Schmidt, and raised his arms, "like we're going to fight right there in . . . the entryway." Defendant and Schmidt were "looking straight at each other." According to Meyer, defendant turned around "very aggressively" to face Schmidt. To Meyer, "it looked like . . . [defendant] was going to assault . . . Schmidt."

Substantial evidence supports the conclusion that defendant acted willfully when he tried to go into his apartment, Sergeant Schmidt grabbed his arm, and defendant pulled away from Schmidt and assumed a fighting posture. "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply *a purpose or willingness to commit the act*, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." (§ 7, subd. (1), italics added.) Defendant's actions, as described by Captain Cramer, Officer Meyer, and Sergeant Schmidt, establish defendant harbored "a purpose or willingness to commit the act" of violently pulling away from Schmidt and assuming a fighting stance in response to Schmidt's efforts to guide him away from the apartment. (§ 7, subd. (1).) No more

8

was required to establish willfulness. Section 148, subdivision (a) contemplates "a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence." (*In re Muhammed C., supra*, 95 Cal.App.4th at p. 1329.)

Defendant asserts he did not act willfully because "he did not know what he was doing or what was happening around him." There was evidence indicating defendant was not entirely coherent at the time. Captain Cramer testified the male he escorted out of the apartment did not appear to understand what was happening and was "out of it." Sergeant Schmidt testified that, as defendant was being escorted out of the apartment, "he . . . seemed like he was not completely coherent at the time." Officer Meyer testified defendant was not "very responsive verbally," and that he was in a daze.

However, viewing the record in the light most favorable to the judgment and presuming in support of the judgment every fact the trier of fact reasonably could infer from the evidence (*Covarrubias, supra*, 1 Cal.5th at p. 890), this evidence did not establish defendant lacked the purpose or willingness to commit the acts at issue or that he did not act willfully (§ 7, subd. (1)). Substantial evidence supports the trial court's determination, and reversal is not warranted merely because the circumstances might also reasonably be reconciled with a contrary finding. (*Covarrubias*, at p. 890.)

*Resisting, Delaying, or Obstructing a Peace Officer*

Defendant asserts there was not substantial evidence both that he resisted, delayed, or obstructed Sergeant Schmidt in the performance of his duties, and that he knew Schmidt was a peace officer.

Taking the latter contention first, defendant relies on *In re A.L.* (2019) 38 Cal.App.5th 15. In that case, a panel of the Sixth Appellate District concluded: "Willfully is most naturally read as synonymous with knowingly, because ' "the term 'willfully' . . . imports a requirement that 'the person knows what he is doing.' " '

9

[Citations.] When 'willfully' is the mental state required for a crime, the perpetrator must have actual knowledge of the relevant facts. [Citation.] Therefore, section 148, subdivision (a)(1)—like the similar offense described by section 69—requires that a defendant have actual knowledge he or she is resisting an officer in the performance of duty." (*Id.* at p. 22.)

Another panel of the Sixth Appellate District subsequently declined to follow *In re A.L.*, holding that "section 148, subdivision (a)(1) does not require actual knowledge." (*People v. Mackreth* (2020) 58 Cal.App.5th 317, 334 (*Mackreth*).) The *Mackreth* court explained, "the word 'willfully' is defined in the Penal Code, and its definition does not encompass a requirement of actual knowledge." (*Id.* at p. 330, discussing § 7, subd. (1).) Considering the legislative history of section 148, subdivision (a)(1) and section 69, the *Mackreth* court noted, "[b]y simultaneously enacting these two related statutes in 1872 and using 'willfully' to describe the required mental state for a section 148 offense but 'knowingly' to describe the required mental state for a section 69 resisting offense, the Legislature clearly expressed its decision to require *different* mental states for the two offenses." (*Mackreth*, at p. 331.) The *Mackreth* court also found it significant that in 1997 the Legislature amended "section 148 to add subdivision (a)(2), which uses 'knowingly and maliciously' to describe the mental state required for the related offense of disrupting, impeding, or interfering with a police communication, provid[ing] further evidence of the Legislature's recognition that 'willfully' in section 148, subdivision (a)(1) is not equivalent to actual knowledge." (*Ibid.*) Finally, the *Mackreth* court noted that because the 1997 amendment took place long after the court in *People v. Lopez* (1986) 188 Cal.App.3d 592 held that section 148, subdivision (a)(1) did not require actual knowledge, the Legislature's failure to change the "willfully" language of section 148, subdivision (a)(1) in light of *Lopez* was "another strong indicator that the Legislature did not intend for a section 148, subdivision (a)(1) offense to require actual knowledge." (*Mackreth*, at p. 332; see *People v. Weidert* (1985) 39 Cal.3d 836, 844

["The enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted"].) We are persuaded by *Mackreth* and decline to follow *In re A.L.* As such, the People were required to prove defendant knew *or should have known* Sergeant Schmidt was a police officer.

Sergeant Schmidt and Officer Meyer both arrived in marked patrol vehicles. They were both wearing police uniforms. When they pounded on the apartment door, they announced they were from the police department, although the evidence suggests defendant was sleeping at this time. After defendant was escorted out of his apartment, Schmidt followed him as he walked around the area. As Schmidt attempted to steer defendant to medical personnel and tried to prevent him from going back into his apartment, defendant would look at Schmidt, who was in his uniform, and scowl, "not in an aggressive manner but almost like what are you doing, like, who are you." When Schmidt grabbed defendant's arm and defendant turned on him, Schmidt and defendant were "looking straight at each other." At the time, there were police, fire department, and medical personnel on site. Based on the foregoing, we conclude substantial evidence supports the conclusion defendant knew or should have known Schmidt was a police officer.

As for whether defendant resisted, delayed, or obstructed Sergeant Schmidt, after defendant walked around outside of his apartment for a bit, he started walking back toward the apartment. Officers did not want defendant returning to the apartment because (1) it was not known to be safe from smoke and related unknown hazards, and (2) defendant had displayed aggression towards at least one firefighter, and firefighters were still working in the apartment. At least once, Schmidt told defendant, "you can't go into the apartment." Additionally, Schmidt repeatedly tried to steer defendant away from his apartment and towards medical personnel. After Schmidt grabbed defendant's arm, defendant pulled away from Schmidt really hard. Defendant pulled or "rip[ped]" away from Schmidt really hard, spun around, and faced him. He raised his arms, "like we're

11

going to fight right there in . . . the entryway." Defendant and Schmidt were "looking straight at each other." According to Officer Meyer, defendant turned around "very aggressively" to face Schmidt. To Meyer, "it looked like . . . [defendant] was going to assault . . . Schmidt." This constitutes substantial evidence defendant resisted, delayed, or obstructed Schmidt in the discharge of his duties. (§ 148, subd. (a)(1).)

To the extent defendant contends there must be a showing Sergeant Schmidt attempted to detain him, the statute does not contain such a requirement. (§ 148, subd. (a)(1).) Defendant relies on *In re Charles G.* (2017) 14 Cal.App.5th 945 for the proposition that the "focus of the inquiry is whether [defendant] resisted efforts to detain him." However, whether the defendant resisted efforts to detain him was simply the focus in that case based on the juvenile court's findings. (*Id.* at p. 957.)

*Sergeant Schmidt Was Lawfully Performing His Duties*

Defendant asserts Sergeant Schmidt "was not lawfully performing his duties because his actions amounted to an unreasonable seizure and excessive force, and were not justified by exigent circumstances or the community caretaking exceptions."

The " 'touchstone for all issues' " under both the Fourth Amendment of the United States Constitution and article I, section 13, of the California Constitution is " 'reasonableness.' " (*People v. Buza* (2018) 4 Cal.5th 658, 670; see *Riley v. California* (2014) 573 U.S. 373.) "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." (*Florida v. Jimeno* (1991) 500 U.S. 248, 250.) A seizure occurs " 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . .' " (*Florida v. Bostick* (1991) 501 U.S. 429, 434.) Any alleged seizure or detention here appears to have occurred, at least in part, in the entryway of defendant's apartment or apartment building.

" ' "A long-recognized exception to the warrant requirement exists when 'exigent circumstances' make necessary the conduct of a warrantless search." ' [Citation.] The term 'exigent circumstances' describes ' " 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.' " ' " (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041 (*Ovieda*).) " ' " '[I]n each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " ' " (*Ibid.*) The high court has "found exigency when an entry or search appears reasonably necessary to render emergency aid, whether or not a crime might be involved." (*Id.* at pp. 1041-1042.) " 'Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. . . . "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' " (*Id.* at p. 1042.) " 'Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' " (*Ibid.*) "Thus, the exigent circumstances exception applies to situations requiring prompt police action." (*Ibid.*)

"A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' " (*Michigan v. Tyler* (1978) 436 U.S. 499, 509; see also *People v. Poulson* (1998) 69 Cal.App.4th Supp. 1, 5 [a " 'myriad of circumstances could fall within the terms "exigent circumstances" ' " including " 'smoke coming out a window or under a door' "].) "[A] warrantless entry in response to an actively suicidal person may be justified to prevent injury. '[T]he threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment.' " (*Ovieda*, 7 Cal.5th at p. 1042.)

13

Here, police and fire personnel responded to defendant's apartment based on reports of a structure fire. Upon arriving, they found defendant's apartment was filled with smoke and a fire alarm was going off. After fire personnel escorted defendant out of the apartment, defendant, who was somewhat incoherent and "out of it," started to go back into his apartment where firefighters were still at work. Sergeant Schmidt stopped defendant from going back in by grabbing his arm. Schmidt stopped defendant because it was not safe for him to return to his apartment due to the smoky and related unknown conditions. Schmidt believed defendant going back into his apartment constituted a risk to defendant's safety as well as to the safety of firefighters inside the apartment. Officer Meyer did not want defendant going back into the apartment both because of the smoke and based on defendant's aggression towards one of the firefighters. We conclude that substantial evidence supports the conclusion that police reasonably believed exigent circumstances warranted their preventing defendant from reentering his apartment.

Citing *Ovieda*, defendant asserts a police officer's "subjective intent to ensure [defendant's] safety is irrelevant." This may be true, but it does not help defendant here. " 'An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." [Citation.] The officer's subjective motivation is irrelevant.' " (*Ovieda, supra*, 7 Cal.5th at p. 1052, quoting *Brigham City v. Stuart* (2006) 547 U.S. 398, 404.) However, we have concluded the circumstances, viewed objectively, justified Sergeant Schmidt's action in grabbing defendant's arm and preventing him from reentering his apartment.

Defendant also asserts, in passing and without analysis or citation to authority, that Sergeant Schmidt was not lawfully performing his duties because he used excessive force. "It is the appellant's burden to demonstrate the existence of reversible error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and

14

citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Hence, conclusory claims of error such as this will fail. (*Ibid.*)

*Conclusion*

Substantial evidence supported the trial court's determinations. Accordingly, the trial court did not abuse its discretion in revoking and reinstating probation and extending probation to November 16, 2020. Defendant's due process argument is premised on his assertion that substantial evidence did not support the trial court's determination and that the People failed to proffer sufficient evidence to prove a probation violation by a preponderance of the evidence. Because we have reached a contrary conclusion, defendant's due process claim is without merit.

DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

We concur:

_____

ROBIE, J.

_____

KRAUSE, J.

15