[No. A101269. First Dist., Div. Three. Dec. 31, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MERIDETH MORTON et al., Defendants and Appellants.

**COUNSEL**

Harrington & Ingram and Richard J. Ingram for Defendants and Appellants.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Lisa Ashley Ott, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORRIGAN, J.**—Here the trial court concluded that detectives' entry onto private property was justified by the community caretaking exception to the search warrant requirement. That conclusion is not supported by substantial evidence. Accordingly, the denial of defendants' suppression motion is reversed.

### FACTUAL AND PROCEDURAL HISTORY

Defendants Robert and Merideth Morton operate a commercial nursery in Santa Rosa and live on the property. During the week of September 24, 2001, an unidentified man called the Sonoma County Sheriff's Department and reported that his neighbors, the defendants, were cultivating marijuana at the nursery. On September 28, detectives Andrea Salas and Stephen Gossett, assigned to a marijuana suppression team, visited the nursery but saw no indication of marijuana cultivation.[1]

On October 9, 2001, a person describing himself as a neighbor of the nursery left a message with the Sheriff's Department. The neighbor gave his first name and asked for "a call back in regards to marijuana cultivation." Salas returned the call about 1:00 p.m. The neighbor expressed concern that the nursery was cultivating marijuana and that "something must have happened over the nighttime hours." The neighbor suspected that "somebody [had] ripped [the nursery] off." The neighbor reported finding marijuana debris on the fence bordering defendants' property and a trail of marijuana debris leading from his driveway to a residential unit on his property occupied by his teenage daughter. Salas and Gossett decided to meet with the neighbor because they "had really limited information, so it was kind of like somebody needed to go find out what he was trying to explain to us."

On their way to speak with the neighbor, the detectives drove past defendants' nursery which they recognized from their visit 10 days earlier. They arrived at the neighbor's property about 2:00 p.m. The neighbor showed the detectives two marijuana leaves hanging near the top and on the neighbor's side of the fence separating his property from defendants'. He also showed them a small amount of marijuana debris in his driveway.[2] The detectives took photographs that show the fence was made of chain link with wooden slats running vertically through the links.[3] Although Salas described

---

[1] Detective Salas was the People's only witness at the suppression hearing.

[2] The court was not asked to accept Salas as an expert in marijuana recognition, nor was any foundation laid to support such a ruling. Her identification of the leaves and debris as marijuana was admitted without objection.

[3] We have reviewed the photographs admitted into evidence at the suppression hearing.

the fence as "pretty high" and "taller than I am," no one established how tall she is and no further clarification was provided for the record. Salas did not look over or under the fence to determine if there was marijuana on defendants' property. As depicted in several of the photographs, the bottom of the fence appears to stand several inches above the dirt and gravel at ground level. One of the photographs shows a small depression in the dirt beneath the fence. Salas described the area as "where someone had gone under the fence." It appears that gravel and leaves have been displaced in the area of the depression. Although the depth of the depression in the dirt appears quite slight in the photograph, it was not further described for the record. In terms of width, the depression appears to be about as wide as a man's boot or a small animal. As depicted in the photograph, the depression is not as wide as the hips or shoulders of even a small person.

Salas and Gossett asked the neighbor whether he had seen defendants that day. The neighbor said he had not and reported that normally the nursery occupants "play loud music," are "out and about" and "tending to the nursery."

Based on her observations of the fence and driveway, Salas testified, "[I]n my mind I was starting to think that there had actually been some sort of trespassing or there had been some other incident. I mean, typically what we would call a marijuana rip off." Salas testified that she and Gossett agreed that "obviously something happened during the nighttime hours" and that they "needed to go next door and find out what exactly happened, and to try to contact the people that live there." Salas and Gossett decided to go to the nursery to determine "if anyone was home, if everything was okay, and then, you know, whatever investigation we had to do after that point, we would determine that at that point."

Salas never testified that she believed defendants might need assistance. Although she had investigated two earlier "marijuana rip offs" involving violence, she and Gossett were still uncertain that a similar theft had taken place at the nursery. The detectives wanted to talk with the occupants of the nursery because their neighbor had not seen them. Nothing in the record suggests that any violence had occurred. The neighbor did not indicate anything that aroused concern for defendants' safety, such as gunshots, yelling, loud noises or any other signs of commotion coming from the nursery during the previous night. Likewise, he did not report hearing anyone on his own property.

Salas radioed the dispatcher before they went onto defendants' property. In her search warrant affidavit Salas said that she advised the dispatcher she would be conducting a "knock and talk" at the nursery for "unknown

marijuana-related activity." On cross-examination she admitted telling the dispatcher she and Gossett would be conducting a "knock and talk" regarding "an 11358," referring to Health and Safety Code section 11358, concerning cultivation of marijuana. Salas never reported that she and Gossett were doing a welfare check on the occupants of the nursery.[4] Nor did she convey to the dispatcher any concern regarding the well-being of the occupants.

When they arrived at the driveway of the nursery, the detectives encountered a "cattle gate" with a sign announcing the nursery was closed on Monday and Tuesday. October 9, 2001, was a Tuesday. The gate was closed with a chain around it. Salas could not recall if it was locked. The detectives climbed over the gate.

The detectives walked directly to the house and knocked several times.[5] From the porch Salas and Gossett could hear people moving inside. Salas did not testify that she heard any sounds of a disturbance from the porch. She did not relate seeing anything on the property that indicated marijuana cultivation or a theft. Indeed, she did not describe seeing or hearing anything out of the ordinary either before or after she scaled the gate. Although defendant Robert Morton peeked through the curtains of the door, he did not immediately open it. Salas announced, "[S]heriff's Department, . . . can we talk to you for a second? Is everybody okay? Who's home? . . . [C]an you come out and talk to us?" The detectives displayed their identification because Morton did not appear to believe they were sheriff's deputies. Salas said, "Hey, we're just hear to talk to you, make sure everybody is okay, . . . can you come outside and talk to us?" The prosecutor elicited no further testimony from Salas. Salas did not describe Morton as appearing to have been injured or in any distress. Defense counsel did not question Salas regarding her contact with defendant at the door nor did he ask any questions about the detectives' later entry into the house.

Robert Morton eventually came onto the porch after repeated requests by the detectives. Salas ultimately applied for a warrant to search the property. Her sworn statement in support of the application[6] contains the following

---

[4] Salas was asked why she did not report that she and Gossett were doing a welfare check of the nursery occupants. Salas responded, "[W]e don't talk to dispatch like that. I wouldn't give dispatch a long-winded—we have certain abbreviations that we use to tell them, Hey, we're going to be out at a location doing an investigation."

[5] Defendants objected to Salas's testimony regarding her conduct at the door of the residence, stating that it was irrelevant. Defendants maintained that the illegal entry was completed once the detectives climbed over the fence. The court overruled the objection.

[6] A certified copy of the search warrant and affidavit were *not* introduced into evidence at the suppression hearing even though defendants moved to quash the search warrant. Although both the People and defendants cite the search warrant affidavit in their factual summary, no one requested that the record be augmented to include these documents. The trial court

description: "We knocked at the mostly glass front door several times. Shortly thereafter, a white male adult came to the front door. However, he refused to open the door after we had identified ourselves verbally as being with the Sheriff's Department and shown him our identification and badges. We eventually convinced the subject we were with the Sheriff's Department and were there to speak with him about the marijuana. The subject opened the door and a heavy odor of marijuana emanated from inside the residence. The subject immediately stepped outside and shut the door behind him. The subject appeared to be nervous and suspicious of our being at his residence. On the subjects [*sic*] clothing were pieces of marijuana leaves and debris." The detectives asked Morton who else was present and if there were weapons inside. They asked Morton to summon the three others he reported were in the house and he refused to do so. Gossett knocked and announced his presence several times but no one else would come to the door. Salas radioed a request that other officers come to the scene. After assistance arrived, the detectives knocked and announced their presence for another two to three minutes but no one responded. Gossett then opened the front door and stood at the threshold. He announced again and two females came to the door. From the threshold, Gossett could see marijuana being processed. Salas obtained the warrant based on the observations outlined above. Nowhere in the supporting affidavit did Salas mention that she feared for the safety of the occupants, or that she ever asked Morton about his welfare or the safety of the others in the house.

Describing the matter as a "difficult case and a close case," the trial court denied the suppression motion. The court ruled that the detectives' warrantless entry onto the property was justified under the community caretaker exception. The court stated: "I found it of significance, in looking at a lot of the surrounding circumstances, the fact that the officers went out to this report without radios, without calling for back-up. In other words, they weren't going in as the SWAT team, set to storm the gates, but went out to investigate this report from a concerned citizen. And then certainly there was evidence that there may have been a marijuana rip off, and at that point had concerns for the folks next door, considering that there had been no activity."

Following the trial court's ruling, Robert Morton pled no contest to possession of marijuana for sale and admitted an arming enhancement.

indicated that it had reviewed the moving papers submitted below, which included the search warrant and affidavit attached as an exhibit. Moreover, we presume that the trial court, in ruling on a motion to quash, reviewed the search warrant lodged with the superior court. In view of these circumstances, and in order to expedite the disposition of this appeal, this court on its own motion has augmented the record with a certified copy of the search warrant and affidavit. (Cal. Rules of Court, rule 12(a)(1)(A).)

Merideth Morton pled no contest to cultivation of marijuana. Both were placed on three years' probation and ordered to serve nine months and six months in jail respectively.

## DISCUSSION

██ Except in extraordinary circumstances, the Fourth Amendment to the Constitution prohibits government agents from infringing upon a person's reasonable expectation of privacy in the absence of permission or warrant. It is undisputed that the detectives here had neither when they climbed over a closed gate and entered defendants' property. In *People v. Ray* (1999) 21 Cal.4th 464 [88 Cal.Rptr.2d 1, 981 P.2d 928], a plurality of our Supreme Court articulated the "community caretaking exception" to the general rule requiring a warrant. Under this exception, "circumstances short of a perceived emergency may justify a warrantless entry" to preserve life or protect property. (*Id.* at p. 473.) In *Ray* Officers Tan and Cary were sent to a residence on Christmas Day after a neighbor reported that "the door has been open all day and it's all a shambles inside." (*Id.* at p. 468.) The officers found the front door standing open about two feet. The front room "appeared to be ransacked as if someone went through it." (*Ibid.*) There was no response to the officers' repeated knocking and loud announcement of their presence. Based on his experience, Cary concluded that there was a " '95 percent' likelihood they had encountered a burglary or similar situation." (*Ibid.*) Concerned about the welfare of people and property inside, the officers entered and saw a large amount of drugs and money. They touched nothing and opened no doors or containers. Finding no one in the residence, they went outside and called a supervisor. (*Id.* at pp. 468–469.) There was no indication that the officers had ever been to the location, knew who lived there, or suspected any criminal activity to be going on there.

The *Ray* plurality drew a sharp distinction between the "exigent circumstances" exception to the warrant requirement and the community caretaking exception. Justice Brown explained that in the case of exigent circumstances, officers enter premises to search for evidence or criminal suspects that the officers have probable cause to believe will be found there. Conversely, the community caretaking exception may *only* be invoked when officers are not acting to solve a crime. " '[T]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police.' [Citations.] Upon entering a dwelling, officers view the occupant as a potential victim, not as a potential suspect." (*Ray, supra,* 21 Cal.4th at p. 471.)[7]

---

[7] The *Ray* plurality provided a clarification regarding an officer's investigatory and non-investigatory capacities: " 'When in the context of a possible burglary or breaking and

The plurality described the applicable standard "under the community caretaking exception [as] one of reasonableness: Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions?" (*Ray, supra,* 21 Cal.4th at pp. 476–477.) Justice Brown went on to point out that, in evaluating whether the officer acted reasonably, weight cannot be given to unparticularized suspicions or "hunches" but only to the " 'reasonable inferences which [an officer] is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' [Citation.]" (*Id.* at p. 477.)

The lead opinion also notes that "two aspects [are] critical to maintaining the essential constitutional balance. First, the authority granted law enforcement is narrowly delimited by the known facts viewed in light of the rationale for the exception." (*Ray, supra,* 21 Cal.4th at p. 477.) Second, courts must be particularly careful to ensure that officers are not allowed to falsely rely on this exception when their true intention is to seek out criminals or evidence of their conduct. "In this regard, the trial courts play a vital gatekeeper role, judging not only the credibility of the officers' testimony but of their motivations. Any intention of engaging in crime-solving activities will defeat the community caretaking exception even in cases of mixed motives. [Citation]" (*Ibid.*)

■ Thus, in evaluating an assertion of the community caretaking exception the trial court is called upon to make findings of fact and to draw conclusions of law. In terms of the facts, the court must determine what information was available to the officer and whether he believed the action he took was necessary. Here the trial court concluded: "[T]here was evidence that there may have been a marijuana rip[-]off and at that point [the detectives] had concerns for the folks next door . . . ." In extending the benefit of the community caretaking exception, the court inferentially found that the detectives' belief in the need to enter defendants' property was totally unrelated to any criminal investigation and that they were not motivated by the desire to engage in crime-solving activity. ■ In evaluating these factual findings by the trial court, we apply a deferential standard. The power to evaluate witnesses, resolve testimonial conflicts, weigh evidence and draw

entering, the police enter a home or other structure in order to come to the aid of a possibly injured or threatened owner or to protect the property of that owner, they are, in one sense of the term, quite obviously investigating the possibility that a crime has occurred. [The] purpose vis-a-vis the burglar they may catch is, of.course, "investigatory." [¶] With respect, on the other hand, to the presumably innocent victims of possible crimes, where persons and/or property are in apparent danger, the police intervention is "non-investigatory" in its purpose and the constraints and hesitation that routinely inhibit a criminal investigation are inappropriate. [Citations.]' " (*Ray, supra,* 21 Cal.4th at p. 476, fn. 4.)

factual inferences reposes with the trial court alone. On appeal, presumptions favor the trial court's proper exercise of its authority. (*People v. Arango* (1993) 12 Cal.App.4th 450, 452–453 [15 Cal.Rptr.2d 629].) Long-standing precedent decrees that we are not empowered to reweigh the evidence, no matter how unpersuasive it may appear on a cold record. (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *Overton v. Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].) Naturally, we abide by that precedent.

 Although our review of factual determinations is deferential, it is not without limit. Factual determinations must be supported by substantial evidence. The court in *People v. Marshall* (1997) 15 Cal.4th 1, 31 [61 Cal.Rptr.2d 84, 931 P.2d 262], described substantial evidence as that which is "reasonable, credible, and of solid value." Even assuming the detective's testimony was credible, the evidence supporting the application of the community caretaking exception was neither reasonable nor of solid value.

The conclusion that "there was evidence of a marijuana rip off" was the justification for the detectives' asserted concern about the safety of defendants' persons and property. The detectives' analysis evolved as follows: Two marijuana leaves were found on the neighbor's side of the fence and a small amount of debris was found on his driveway. The neighbor reported that the marijuana was not his. From these facts, the detectives concluded that the marijuana must have belonged to defendants *and* that defendants must have been cultivating the drug. Based on a small depression under the fence, the detectives further concluded this marijuana crop must have been stolen during the night. Because drug thefts may involve violence, the detectives concluded that a warrantless entry was required to protect defendants' life or property. These conclusions fall under the weight of their own faulty reasoning.

The detectives were entitled to rely on the neighbor's representation that the marijuana found on his property did not belong to him. The further conclusion that the contraband must, perforce, belong to defendants is without support. The neighbor also said he "believed" defendants were cultivating marijuana. The record is bereft of a single articulable fact supporting that belief. Just as officers cannot rely on their own hunches or unparticularized suspicions, they cannot rely on those of lay witnesses.

If there was no basis for concluding the marijuana belonged to defendants, much less that they were growing it, the conclusionary leap that there must have been a violent drug theft based upon a small depression below the fence covers too vast an expanse to be reasonable. The ultimate conclusion that a warrantless entry onto defendants' property was the only reasonable alternative is utterly without support when divorced from the conclusions that the

marijuana on the neighbor's property belonged to defendants; that, therefore, defendants must have been growing more of it; and that their crop had recently been stolen.

The detectives' observation of marijuana in defendant's house was the basis of the search warrant. Those observations occurred after they entered the nursery property. As the reviewing court we must excise all tainted information from the search warrant but uphold the warrant if the remaining information establishes probable cause. (*People v. Weiss* (1999) 20 Cal.4th 1073, 1081 [86 Cal.Rptr.2d 337, 978 P.2d 1257].) ■ Probable cause exists when, based on the totality of the circumstances, there is a "fair probability" that contraband or evidence of a crime will be found at a particular location. (*Illinois v. Gates* (1983) 462 U.S. 213, 236 [76 L.Ed.2d 527, 103 S.Ct. 2317].) Before entering defendants' property, the detectives saw two marijuana leaves on the neighbor's fence and marijuana debris in his driveway, and were aware of the neighbor's "belief" that defendants were cultivating the drug. For the reasons we have discussed, these facts do not establish probable cause. Unsupported by probable cause, the search warrant was invalid.

## DISPOSITION

The judgment is reversed.

McGuiness, P. J., and Parrilli, J., concurred.

On January 7, 2004, the opinion was modified to read as printed above.