Filed 12/17/24  Marriage of N.T. and J.G. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of N.T. and J.G. | |
| N.T., | D083482 |
| Appellant, | |
| v. | (Super. Ct. No. 22FL007973N) |
| J.G., | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Victor M. Torres, Judge.  Affirmed.

Bickford, Blado & Botros and Andrew J. Botros for Appellant.

Niddrie Addams Fuller Singh, Victoria E. Fuller; Wilkinson & Finkbeiner, Hannah J. Engholm and Kristin N. Carbone for Respondent.

## INTRODUCTION

N.T. (Father) has filed an appeal (and alternatively, a petition for writ of mandate, prohibition, certiorari and/or other appropriate relief (writ petition)) in which he challenges an order granting a request of J.G. (Mother) to relocate to Dallas, Texas with the couple's minor child.  Father opposed Mother's request on the ground she perpetrated domestic violence during an incident in which she exhibited a knife (knife incident).

Father asserts the trial court erred by concluding that Mother's conduct during this incident did not rise to the level of domestic violence such that the Family Code[1] section 3044 rebuttable presumption was not triggered. Specifically, he contends the court (1) failed to properly evaluate the evidence relevant to whether Mother's conduct during this incident disturbed his peace; (2) erred in not finding that pointing a knife toward him was threatening conduct; and (3) erred in not finding that Mother's "threat of suicide" (capitalization omitted) constituted "coercive control" and thus domestic violence. We conclude the order is appealable, but we affirm the order because we reject Father's claims of error. In an order filed concurrently with this opinion, we dismiss his writ petition.

FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Mother and Father met in Dallas, Texas, where Mother had lived for most of her life and where Father's parents were then residing. They married in November 2017 and moved to a house in Santee, California. They have one child, a son born in May 2021.

In May 2022, the couple separated. Father moved in with his parents, who by then were living in Bonsall, California. For a period of several months after their separation, Father and Mother divided their time with the child under an informal agreement.

A.    *Petition for Dissolution*

In July 2022, Father filed a petition for dissolution of marriage in which he sought, among other things, joint legal custody and primary physical custody of the child. In the months that followed, the trial court entered a series of *pendente lite* custody orders under which Mother and

---

1    Undesignated statutory references are to the Family Code.

2

Father shared joint legal and physical custody, with the greater share of physical custody being allocated to Mother.

B.    *Mother's Move-Away Request*

In December 2022, Mother filed a request for order seeking to relocate to Dallas with the child. In an accompanying declaration, she averred that she was moving to Dallas to be closer to her family and to take advantage of the lower cost of living. She stated it was in the child's best interest to relocate with her because he was only 18 months old, she had been his primary caregiver since birth, and he was "extremely bonded to [her]." She asked the court to order joint legal custody, grant her primary physical custody, and permit the child to relocate with her to Dallas.

The trial court set the matter for a contested evidentiary hearing. Before the hearing, Mother filed a trial brief in which she argued the *LaMusga*[2] factors weighed in favor of a determination that it was in the child's best interest to move with her to Dallas. She highlighted two events in particular in an effort to show she was in a better position to care for the child and was more likely to facilitate co-parenting.

First, she claimed Father had a history of mental illness and had "attempted suicide on numerous occasions." According to one of Mother's declarations, in April 2022, Mother had walked into the garage of the couple's home with the child in her arms. She found Father sitting with a rope in his hands and contemplating suicide (garage incident). Mother argued this incident raised concerns about Father's ability to handle stressors, particularly if the court modified the custody orders to make him the primary parent.

---

[2]    *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1098 (*LaMusga*).

3

Second, Mother asserted Father had withheld the child from her "when she did not immediately capitulate to his demands" to change their agreed parenting schedule. In a declaration, she explained that from August 29 until September 2, 2022, Father violated their agreed parenting schedule, refused to return the child to Mother for five days, and transferred the child back to her only after she consented to give him overnight visitation (withholding incident). Mother asserted Father was represented by counsel at the time and knew he had the ability to seek assistance from the court, yet he behaved like a "vigilante parent[ ]." She expressed concern over Father's future compliance with court orders and argued the withholding incident weighed against giving him primary custody.

Father, for his part, filed a trial brief in which he asked the court to deny Mother's move-away request and grant him primary physical custody. His opposition centered on the claim the section 3044 presumption against sole or joint physical custody applied because Mother had committed acts of domestic violence.[3] He highlighted two incidents he claimed triggered this presumption.

---

[3] Section 3044 provides in relevant part: "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child, . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Sections 3011 and 3020. This presumption may only be rebutted by a preponderance of the evidence." (§ 3044, subd. (a).) Section 3011 sets forth factors for courts to consider when making a determination of the best interests of a child, and section 3020 sets forth legislative findings and declarations relevant to determining custody arrangements that are in the best interests of children.

4

The first incident happened in late January 2022 (shoe incident). Mother allegedly "threw a shoe at Father while he held [the child]" and then "grabbed for [the child] to pull him out of Father's arms." The second incident was the knife incident, which happened on April 17, 2022. Mother and Father were having an argument about marital issues while the child was asleep in his room. Father stated: "As the argument escalated, Mother pulled a knife from the knife block and brandished it at Father. Father calmed Mother down and convinced her to put it away." Father asserted he was "sincerely scared" by the incident and the "potential harm" Mother could have caused. He acknowledged, however, that Mother's version of this incident was different from his: "By Mother's rendition, after Father stated he believed he would be happier if the parties separated, Mother took the knife out of the butcher's block, handed it to him, and said, 'You might as well just kill me.' . . . Mother stated she was not asking Father to harm her, but that it was an emotional response."

Each parent also filed a request for a statement of decision asking the trial court to decide whether the other parent had perpetrated domestic violence and whether the section 3044 presumption against sole or joint physical or legal custody had been raised and rebutted.

C.    *Evidentiary Hearing on Mother's Move-Away Request*

What was originally scheduled as a two-day evidentiary hearing on Mother's move-away request ultimately lasted six nonconsecutive court days. Over the course of the hearing, the parties presented testimony from numerous witnesses. Mother testified on her own behalf, and she called as witnesses Father as well as the Family Court Services (FCS) mediator. Father testified on his own behalf and presented testimony from his parents, his friend Paul, and expert Dr. Stephen Doyne. Each side also submitted

5

dozens of exhibits. Our summary of the hearing will focus on the knife incident.

Father gave the following testimony about the knife incident. It happened on April 18, 2022, about three weeks after the garage incident. During the marriage, Mother had been concerned about Father's infidelity with a coworker. Father and the coworker "started as friends" but there "was a point . . . where the relationship . . . remained platonic but got too close" and became "inappropriate." In April 2022, Mother learned Father was still talking to this coworker.

On April 18, Father started a discussion with Mother in the living room. The child was upstairs taking a nap in his room. Mother asked Father if he would be happier without her. He responded, "[Y]es, possibly." Mother took his answer to mean he was leaving or divorcing her. She got very upset, almost "hysterical like hyperventilating," started raising her voice, and walked to the kitchen.

Father followed Mother to "make sure she wasn't going to do anything extreme." When he got to the kitchen, Mother pulled from the knife block a "fairly . . . large knife" (one with approximately a six-inch blade), turned around and was pointing it at Father. Father testified: "[S]he was moving it a little bit, but for the most part it was always pointed at me. [¶] She was raising her voice and screaming yelling things. I can't take this anymore. Look at what you're doing to me, things along that nature. And I just repeatedly kept telling her you need to calm down, put it away, please put it away. . . . [S]he was getting a little bit closer, . . . [a]nd she eventually . . . put[ ] it back on the countertop, then she started crying hysterically and went in another room and was just laying down on the floor in that room." Mother did not lunge at Father, but the blade was "a foot or two" away from him. He

6

was able to calm her down, and Mother put the knife away "[a]fter [he] told her many times she need[ed] to calm down and put it away."

After a minute or two, Father heard the child crying on the baby monitor. Mother was laying down sobbing, so Father went upstairs and got the child, changed him, and gave him milk. Then he took the child for a walk and texted his friend Paul. He told Paul, "We just had an argument and she got so irate she pulled a knife out." He said Mother "[w]as pointing at me [*sic*] more than her" but he "calmed her down a little" and "[g]ot her to put it away." Father also told Paul, "[I] got scared and took the baby out for a walk so [the situation] can cool down." Paul responded that Father "[s]hould have called the cops." The topic of the text messages then shifted to the financial consequences of divorce.

On questioning by Mother's counsel, Father agreed he did not move out of the house he shared with Mother until May 15, 2022, and during that time he did not report the knife incident to the authorities or request a restraining order. He also agreed that in April 2022 Mother was five foot three or five foot four and weighed less than him, whereas he was five foot nine, "[m]aybe a little bit less" than 185 pounds, was taking a Brazilian jiu jitsu class and had a punching bag in the garage for practice.

S., Father's mother, testified that Father has a "low key personality" and "tends to shut down if there is conflict and arguments until he is pushed to a certain limit." The morning after the knife incident, Father called her "sobbing" and sounding "very concerned." Father's parents told Father and Mother "to hang in there." S. was "disturbed about the incidents" but her "main goal was to keep the marriage intact."

J., Father's father, testified that Father phoned him and S. the morning after the knife incident. During the call, Mother "grabbed the

7

phone" and started talking. J. told her to settle down and said they would all talk later about "how to make things move forward." J. testified that in his view the knife incident "was a one-time thing."

Paul, Father's friend, testified that Father is a "[l]aid back, relaxed person" who "doesn't do well with conflict." In addition to texting Paul, Father also called Paul after the knife incident. Paul testified Father sounded "scared" and had a tone that was "different." They talked about whether Father should call the police but decided against it because "[they] were hoping things would work out."

Mother testified the knife incident occurred on April 17, 2022. She and Father were talking about their marriage and "how things were falling apart." The child was sleeping upstairs. She asked Father if he felt he would be happier without her, and he said yes. Mother testified: "And so, at that moment, literally, the world collapsed on me. Like, I felt like I was so overwhelmed. I was overwhelmed." She continued: "And I know I got up, and I went and got a knife out of the knife block, and I handed it to him and said, 'You might as well kill me.' [¶] And I remember—and I mean, I definitely regret that decision. That's not something that I should have done at that moment, but, like I said, I was extremely emotional." She stated that "it was a very dramatic response on my end, that I regret, and I shouldn't have done it."

Mother explained the knife incident started when she left the couch where she and Father were sitting and talking and went to the kitchen by herself. Father stayed on the couch but "eventually" got up. According to Mother, she was crying, not yelling or screaming, and Father was not crying and did not seem scared. To the contrary, his demeanor was "pretty calm," "[f]lat." Mother testified she held the knife by the handle while Father was

8

seven or eight feet away, she did not lunge at Father, and she did not intend to hurt Father.

Mother attended therapy from May 2022 until April 2023, when she was discharged by her therapist. She discussed the knife incident with her therapist multiple times. The therapist did not refer her for treatment on suicidality or homicidality and did not direct her to take a domestic violence course or anger management course.

As we have mentioned, Mother also called the FCS mediator to testify about her impressions and conclusions after two mediation sessions the parents attended together. At the first session, Father talked about Mother's "alleged [domestic violence]." The mediator was of the opinion Mother's "alleged anger issues" were "more situational with . . . the ending of their relationship. It wasn't an ongoing issue that he told me." The mediator was more concerned about Father's history of suicidal thoughts than Mother's "history of anger." At the second session, both sides continued to make domestic violence allegations. Although Father did not think the mediator considered his allegations "as much as he thought [she] should," the mediator felt she considered them adequately. The mediator acknowledged Father said Mother "would yell at him" and "throw things at him" and agreed with Father's counsel these were acts of domestic violence. However, she did not believe there had been a pattern of domestic violence. Instead, her impression was that "those incidents . . . happened [when] their relationship was breaking down." The mediator felt both parents were able to provide a safe environment for the child, and she ultimately recommended for the child to be placed in Mother's primary care.

Finally, Dr. Doyne, a psychologist with a special interest in domestic violence cases, testified as Father's retained expert. Dr. Doyne had never

9

met Mother and therefore did not offer an opinion about her. He also was not acting as an Evidence Code section 730 custody evaluator, did not perform a section 3011 child custody evaluation, and was not offering a recommendation as to the custodial plan.

Most of Dr. Doyne's testimony was provided in response to questions about hypothetical scenarios about a parent either pointing a knife or expressing suicidal ideation, or about the *LaMusga* factors. On the topic of pointing a knife, he testified that "if [a parent] pulled a knife," he "would ask them what was going on," whether it "was an impulsive act of trying to harm a spouse or an ex-spouse or harm themselves." He would also want to know if the parent had accepted responsibility and was working in therapy to learn what triggers impulsive behavior. He testified that all licensed therapists in California are mandated reporters. If the perpetrator of the knife incident told a therapist about the incident and the therapist had concerns, the therapist would have to report the behavior. Dr. Doyne agreed the end of a marriage can be highly stressful, and a person going through a highly stressful situation may catastrophize.

In the attorneys' closing arguments, Mother urged the court to conclude the knife incident was not an act of domestic violence. She argued it was an isolated emotional outburst that happened as the parties' marriage was ending. She further argued there had been "various descriptions" of the incident, "both from the two people that were there, and also several other biased persons." She stated, "credibility is a huge issue in this case" and "[w]e'll never really know how Father actually felt about the knife incident."

Father argued the trial court could not grant Mother's move-away request and make her the de facto primary parent because she had committed acts of domestic violence—the shoe incident and the knife

10

incident. He claimed the knife incident in particular "disturb[e]d Father's peace" and was an "assault." He argued Mother did not rebut the section 3044 presumption because she did not acknowledge that she perpetrated domestic violence and "takes no responsibility." In Father's view, the only evidence that could plausibly be considered to rebut the presumption was Mother's therapy records, but they failed to show "responsibility being taken."

D.     *The Trial Court Grants Mother's Move-Away Request*

The trial court announced its ruling orally from the bench. The court prefaced its ruling by acknowledging it found the decisions required by the move-away request to be difficult. The court told the parties it had examined the case "very carefully" and had given particular consideration to two questions—"is there a bias in favor of one party or one parent or one gender especially over the other" and "would I make this same decision if the genders were reversed[.]" In the end, however, the court concluded that none of Mother and Father's allegedly wrongful acts[4] rose to the level of domestic violence.

Specifically as to the knife incident, the trial court found Father's mental and emotional calm had not been destroyed. It reasoned: "The totality of the circumstances are that it was a stressful time, there was clear conflict. Whether there was an actual infidelity or not, . . . that was the

---

[4]     Whereas Father claimed the shoe incident and knife incident were acts of domestic violence by Mother, Mother argued the garage incident and certain other patterns of conduct by Father were acts of coercive control such that they constituted abuse or domestic violence. (See § 6320, subds. (a), (c) [disturbing the peace of the other party is an enjoinable form of domestic abuse that includes coercive control].)

11

stress and conflict at the time. I'm sure that it's been regretted, and I think on the stand it was regretted by [Mother]. The evidence was that she took the knife out of the knife block and at various times held it towards her and towards [Father]. [¶] [Father's counsel] has argued that it's an assault, but [Mother] didn't say, 'I'm going to kill you,' she said, 'why don't you just kill me,' in my mind, evidencing her emotional distress at the time. At no time did I hear that [Father]—who I think is a very calm person generally—at no time did I hear he backed up. At no time did I hear that he tried to disarm [Mother]. At no time did he call the police. And he, you know, made discussions afterwards by text with his friend Paul that did not seem, to me, to reflect that his mental and emotional calm had been destroyed. Certainly it's a concerning incident, but under the totality of the circumstances, I don't find that it was an assault. I don't find that it was domestic violence under the Domestic Violence Protection Act."

Because the trial court found neither Mother nor Father had perpetrated domestic violence, it did not decide whether the section 3044 presumption had been rebutted. Instead, it considered the *LaMusga* factors and decided it was in the child's best interest to be in Mother's primary care, and thus permitted the move. The court stated its order was subject to a 30-day waiting period, which Father declined to waive. It then granted joint legal custody to both parties, set a parenting schedule for the parties to follow until the move-away, ruled that Mother would have primary physical custody of the child once she relocated, and established a parenting schedule to be followed after that point.

Mother subsequently submitted a proposed statement of decision that included the following paragraph of findings about the knife incident: "When determining whether the event is 'domestic violence[,]' the court is required

to consider whether it destroyed Father's calm. The court believes that it was a stressful time in the parties' relationship, and there were allegations of infidelity against Father. The evidence presented was that Mother took the knife out of a knife block, and at various times, she held it towards her and Father. Father's counsel argues that the event was assault, but the court noted that Mother said to Father 'why don't you just kill me?[,]' which is reflective of her emotional distress. The Court further noted that it believes that Father is a very calm person generally. At no time did Father back up from Mother, try to disarm her, or call the police, and he texted his friend, Paul . . . with messages that did not seem to reflect his calm was destroyed. Further, Mother shows that she regrets the incident. In conclusion, the Court found the incident to be of concern, but did not find that it was domestic violence under the Domestic Violence Protection Act, Family Code section 6200, et seq." (Italics omitted.)

Father filed an objection to the proposed statement of decision in which he asked the court to address "whether [Mother's] conduct constituted 'abuse' under both Family Code sections 6203[, subdivision ](a)(1), and 6203[, subdivision] (a)(3), not just under section 6203[, subdivision] (a)(4), where the Court considered whether [Father's] peace was disturbed."

The trial court then issued a final statement of decision that set forth two paragraphs about the knife incident where the proposed statement of decision contained only one. The first paragraph was identical to the above paragraph from the proposed statement of decision. The second paragraph was new. It stated: "Father urges the Court to state its legal reasoning and make factual findings as to whether this event constituted 'abuse' under Family Code section 6203[, subdivision] (a)(1) (intentionally or recklessly or attempting to cause bodily injury), and section 6203[, subdivision] (a)(3)

13

(placing a person in reasonable apprehension imminent serious bodily injury to themselves or another).  For the same reasons stated above, the Court does not find that Mother's actions rose to the level of showing 'abuse' under sections 6203[, subdivision] (a)(1) or 6203[, subdivision] (a)(3).  It was an emotional moment for Mother, she reacted poorly, but never threatened to harm Father.  Her threat to harm herself was, under the emotionally charged circumstances of the moment, was simply an expression of her hurt feelings and frustration."

On January 12, 2024, the trial court issued its findings and order after hearing (FOAH).  On January 17, Father filed a notice of appeal of the FOAH.  At Father's request, the trial court then stayed the move-away order "pending resolution of appeal or other order of [the] Court of Appeal."

DISCUSSION

I.

*Because the FOAH Is Appealable, We Will Dismiss Father's Writ Petition*

After Father filed his notice of appeal identifying the FOAH as the challenged trial court order, Father filed a writ petition as a precautionary measure in the event we decided the FOAH was not appealable.  We can consider his challenges to the FOAH by way of direct appeal or writ petition, but not both.  (See *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696 ["Generally, a reviewing court acts in the procedural context of either a direct appeal or a writ proceeding."].)  Before we proceed to the merits of Father's challenges, we must therefore decide whether the FOAH is appealable.

"It is settled that the right to appeal is strictly statutory, and a judgment or order is not appealable unless made so by statute."  (*Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1377–1378 (*Enrique M.*).)  "Code

14

of Civil Procedure section 904.1 is the main statutory authorization for appeals." (*Ibid.*)  It provides in relevant part that an appeal may be taken from a final judgment (Code Civ. Proc., § 904.1, subd. (a)(1)) and a "final order or judgment in a bifurcated proceeding regarding child custody or visitation rights" (*id.*, subd. (a)(14)).

It is also settled that temporary custody orders are interlocutory and not appealable.  (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 559–560.)  However, a final order entered after a contested hearing on custody is a final judicial determination of custody that is akin to a final judgment and is appealable.  (*Enrique M., supra*, 121 Cal.App.4th at pp. 1377–1378, discussing *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 253–254 and *LaMusga, supra*, 32 Cal.4th 1072.)  Similarly, a move-away order cannot be issued on a temporary basis or in the absence of a contested hearing (*Andrew V. v. Superior Court* (2015) 234 Cal.App.4th 103, 107), and may be considered by direct appeal (see *In re Marriage of Edlund & Hales* (1998) 66 Cal.App.4th 1454, 1466 (*Edlund & Hales*) [appeal from order granting move-away request]; see also *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 7, 14 [appeal from order denying move-away request]).

Here, Father and Mother are aligned on the FOAH's finality.  Father takes the position the FOAH is a final order on relocation, child custody, and visitation that "effectively conclude[d] the custody case" and was not intended to be superseded by a subsequent custody award.  Similarly, Mother asserts the FOAH "was a final adjudication" that was considered by the parties and trial court to be a final determination of her relocation request.

We agree with the parties' characterization of the FOAH as a final order on relocation and child custody, and we are satisfied it is appealable. (*Enrique M., supra*, 121 Cal.App.4th at pp. 1377–1378; *Edlund & Hales,*

15

*supra*, 66 Cal.App.4th at p. 1466.) Because we will decide the merits of Father's challenge to the FOAH by way of his appeal, we will dismiss his petition for writ relief by separate order. (See *Villery v. Department of Corrections & Rehabilitation* (2016) 246 Cal.App.4th 407, 410 [petition for writ of mandate subject to dismissal where the plaintiff has an adequate remedy at law]; accord *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1119.)

## II.

### *Father Fails To Establish That the Trial Court Erred When It Rejected His Claim That the Knife Incident Disturbed His Peace*

All of Father's challenges to the FOAH are directed at the trial court's ruling that the knife incident was not an act of domestic violence. Father claims the court's failure to make a domestic violence finding was erroneous and the error was prejudicial because there was a reasonable probability the court would have denied Mother's move-away request had it applied the section 3044 presumption.

A. *Relevant Legal Principles*

The custody orders that preceded Mother's move-away request were temporary rather than permanent. Where, as here, a trial court considers "a parent's request to relocate [a] child in the context of an initial custody determination . . . [t]he court must decide de novo what physical custody arrangement would be in the child's best interests, *assuming that the requesting parent will relocate.*" (*Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1127; see *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 22 [when there has been no final custody determination, a trial court presented with a parent's move-away motion must decide what custody arrangement would be in the child's best interests " 'if and when' " the parent moves].)

16

A court's application of the best interest standard may be subject to a presumption triggered by section 3044. Under section 3044, "[u]pon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child . . . , there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to [the perpetrator] is detrimental to the best interest of the child." (§ 3044, subd. (a).) For purposes of this provision, "a person has 'perpetrated domestic violence' when the person is found by the court to have intentionally or recklessly caused or attempted to cause bodily injury, or sexual assault, or to have placed a person in reasonable apprehension of imminent serious bodily injury to that person or to another, or to have engaged in behavior involving, but not limited to, threatening, striking, harassing, destroying personal property, or disturbing the peace of another, for which a court may issue an ex parte order pursuant to Section 6320 to protect the other party seeking custody of the child or to protect the child and the child's siblings." (*Id.*, subd. (c).) If the court finds the party seeking child custody has perpetrated domestic violence, it must apply the section 3044 presumption. (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1498.) "A court may not 'call . . . into play' the presumption contained in section 3044 only when the court believes it is appropriate." (*Ibid.*)

However, even where the court makes a domestic violence finding, the presumption of detriment that arises from the finding is rebuttable. "The presumption is overcome . . . if the trial court finds by a preponderance of the evidence that (1) 'giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child,' and (2) specified factors, on balance, support legislative findings concerning the physical and legal

17

custody of children." (*C.C. v. D.V.* (2024) 105 Cal.App.5th 101, 109–110, quoting §§ 3044, subds. (a)–(b), 3011, 3020.) "The court must 'make specific findings on each of the factors' and—if it determines the perpetrator has overcome the presumption—it must 'state its reasons in writing or on the record.'" (*C.C.*, at p. 110.)

The abuse of discretion standard of review applies to custody and visitation orders, including move-away orders. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 34 [custody and visitation order]; *Edlund & Hales, supra*, 66 Cal.App.4th at p. 1466 [move-away order]; *F.T. v. L.J., supra*, 194 Cal.App.4th at p. 14 [same].) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted (*Haraguchi*).)

Father claims the trial court erred as a matter of law when it ruled that the knife incident did not constitute domestic violence. An abuse of discretion can occur "if the trial court 'applies improper criteria or makes incorrect legal assumptions.'" (*C.C. v. D.V., supra*, 105 Cal.App.5th at p. 109.) "Whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law requiring de novo review." (*Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166, 1179 (*Vinson*) [cleaned up].) As the party appealing the FOAH, Father bears the burden of demonstrating error. (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 110, fn. 1.)

B.    *Analysis*

Father claims the trial court erred when it rejected his claim that the knife incident constituted domestic violence because it disturbed his peace.

"[D]isturbing the peace of another" is a form of domestic violence. (§ 3044, subd. (c).) " '[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).) When a court considers whether an alleged perpetrator disturbed the peace of the other party, it is not required to apply "an objective, reasonable person standard." (*Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 121 (*Parris J.*).) "Instead, the relevant inquiry is simply whether the person . . . engaged in 'conduct that . . . destroy[ed] the mental or emotional calm of the other party.' " (*Ibid.*)

Father's specific challenge to the trial court's ruling is that the court failed to "recognize" his fear of Mother. (Capitalization and boldface omitted.) In essence, he claims the court erred by failing to find the knife incident scared him and therefore destroyed his calm. He argues that the court misunderstood the " 'fight, flight, or freeze' response" (capitalization and boldface omitted), failed to comply with principles articulated in *Vinson*, and used reasoning that was otherwise flawed.

Before we analyze the merits of Father's arguments, we pause to acknowledge the broader concerns raised by Father in his appeal. In his opening brief, Father expresses the view that "an aggressor displaying a knife threateningly in a domestic altercation constitutes domestic violence, regardless of the gender dynamics involved." He claims "[i]n dismissing the act as an emotional outburst, the trial court mirrored a dated perspective," one that "suggests . . . women's actions, particularly violent ones, are primarily driven by uncontrolled emotions rather than intent or rational thought. He criticizes the court for adopting a view that that "undermines the seriousness of domestic violence" and "contradicts modern understandings of gender equality."

19

We are not insensitive to Father's concerns. The trial court's ruling is not a model of clarity. Its analysis of the knife incident is relatively truncated, and we can appreciate how the court may have appeared to give short shrift to his claim that it was an act of domestic violence. If we were the trial court, we might have analyzed the claim differently. However, two considerations countenance against reversal of the court's ruling.

First, the court gave conscious consideration to the possibility of implicit bias, and in doing so took what most consider to be the first step in proactively counteracting the influence of implicit bias on judicial decisionmaking. (See, e.g., *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 829 ["implicit bias is, by definition, *un*intentional and *un*conscious"]; Gov. Code, § 68088, subd. (b) [authorizing Judicial Council to develop training on implicit bias]; Stats. 2019, ch. 418, § 1 [in amending Government Code section 68088 to authorize training on implicit bias, the Legislature finds and declares "individuals can reduce the negative impact of their implicit biases by becoming aware of the biases they hold and taking affirmative steps to alter behavioral responses and override biases"].)

Second, and more importantly, as an appellate court we are bound by fundamental principles that preclude us from substituting our views for those of the trial court. (See *Mechling v. Asbestos Defendants* (2018) 29 Cal.App.5th 1241, 1249 [an appellate court cannot substitute its discretionary decision for that of the trial court]; *In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 952 [an appellate court does not reweigh evidence or make credibility determinations]; *People v. Morton* (2003) 114 Cal.App.4th 1039, 1048 ["Long-standing precedent decrees that [an appellate court is] not empowered to reweigh the evidence, no matter how unpersuasive it may

appear on a cold record."].)  These principles compel us to affirm the trial court's ruling.

The relevant principles are as follows.  " 'A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  When an appellant challenges a trial court's resolution of factual issues, our role is limited to reviewing those findings for substantial evidence. (*Haraguchi, supra*, 43 Cal.4th at p. 711.)  "It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)  And when we consider the validity of a trial court's factual findings, "we resolve all conflicts in the evidence in [the respondent's] favor and indulge all reasonable, legitimate inferences in favor of upholding the trial court's order." (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 364 (*McCord*).)  "If two or more reasonable inferences can be reasonably deduced from the facts, we have no authority as a reviewing court to substitute our judgment for the trial court's judgment." (*Ibid*.)  The pertinent inquiry is whether substantial evidence supports the trial court's factual finding, "not whether a contrary finding might have been made." (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702.)

Significantly, these principles are supplemented by the doctrine of implied findings.  " '[U]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made *every* factual finding necessary to support its decision.' " (*Thompson, supra*, 6 Cal.App.5th at p. 981, italics added; see Eisenberg, California Practice Guide:  Civil Appeals and Writs (Rutter Group, 2023) § 8.22, p. 8-9 [under the

doctrine of implied findings, "the appellate court will presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record"].)

The doctrine of implied findings applies here. Father did not object that the trial court's proposed statement of decision omitted findings necessary to its determination that Mother did not disturb his peace. Consequently, he did not complete the requirements necessary to avoid the doctrine of implied findings. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134 [outlining the procedural requirements for avoiding implied findings on appeal].)

Returning to Father's challenges to the trial court's rejection of his claim that Mother disturbed his peace, the difficulty with his arguments is that they raise *factual* rather than legal issues. His specific quarrel is with the trial court's asserted failure to "recognize [Father's] fear." (Boldface and capitalization omitted.) But fear is a subjective state of mind. And a party's subjective state of mind is generally a question of fact. (*Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 36 (*Smith*).) A question that is ordinarily one of fact can become a question of law when the underlying evidence is undisputed and only one inference can be drawn from that evidence. (*Pinto v. Farmers Ins. Exchange* (2021) 61 Cal.App.5th 676, 689 (*Pinto*).) But here, the parties presented conflicting evidence on the question of whether Father was afraid of Mother (and whether any such fear rose to the level of destroying his mental or emotional calm).

Mother testified that during the incident Father's demeanor was "pretty calm" and he did not "seem scared." Father, on the other hand, testified he was scared during the incident and told Paul afterwards that he "got scared," and Paul testified that Father's voice sounded "scared" during

22

their post-incident phone call. The trial court was also presented with circumstantial evidence of Father's emotional state (i.e., his behavior during and after the incident), and as we will discuss this circumstantial evidence supported conflicting inferences.

Thus, whether the knife incident scared Father (and whether his fear was such that his mental or emotional calm was destroyed) was an issue of fact for the trial court to resolve in its role as factfinder. Although in its statement of decision the court did not make an express finding that the knife incident did not scare Father, it expressly rejected Father's claim that the incident destroyed his calm. From this rejection, we must infer the court impliedly resolved the factual dispute over Father's fear against Father and in favor of Mother. Father appears to recognize that the court's ruling embraces this implied finding. He acknowledges in his reply brief that the court "concluded [he] was not afraid." Moreover, Father does not contend the court's implied factual finding was unsupported by substantial evidence. Even if he had brought such a challenge, we would be compelled to reject it because the evidence on this issue was conflicting and we are required to resolve all conflicts in the evidence in favor of the court's findings and orders. (*McCord, supra*, 51 Cal.App.5th at p. 364.)

Instead, Father purports to be asserting only legal challenges to the trial court's implied findings. However, when we examine his arguments it becomes apparent they are factual rather than legal. Father's main quarrel is with the following passage from the court's statement of decision: "At no time did Father back up from Mother, try to disarm her, or call the police, and he texted his friend, Paul . . . with messages that did not seem to reflect that his calm was destroyed." Father argues in part that by relying on his failure to disarm Mother or back away from her, the court erroneously

23

"overlook[ed] the 'freeze' response noted in trauma research." But Father presented no evidence of a "freeze" response, expert or otherwise, for the trial court to consider during the evidentiary hearing. His failure to do so both forfeits and renders meritless his appellate claim that the court erred by "overlooking" the purported freeze response.[5] (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548; *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 700.)

Father also argues that his failure to try to disarm Mother was an indication he *was* afraid of her, and he asserts his decision not to call the police "was appropriate for someone fearing his partner." He also contends the trial court's reliance on his text messages to Paul was "puzzling" because many (but not all) of the messages corroborated his claim of fear. These arguments are also unavailing. The facts identified by Father are capable of supporting inferences that either undermine *or* support his claim that he was afraid. Through his arguments, Father is attempting to persuade us of the

---

[5]   Father argues in reply that we should overlook the forfeiture because (1) further factual development is not required and (2) his arguments implicate the public interest and due administration of justice. We are not convinced. Contrary to his first argument, his claim that his actions were part of a "freeze" response *is* a factual theory, and it is totally undeveloped because he presented no evidence of it at the hearing. His second argument is unavailing because the public interest and due administration of justice exceptions to forfeiture are generally applied when the forfeiture involves a legal issue. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293–1294 ["the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"]; cf. 13 Witkin Cal. Proc. (6th ed. 2012), Appeal, § 436, pp. 472–473 [where forfeiture is based on belated reliance on a new factual theory, the new theory cannot be considered on appeal "where the facts are not uncontroverted"].) Here, whether Father's behavior was consistent with a "freeze" response is a factual issue, not a legal one.

strength of the inferences that favor him.  However, we must reject his arguments because we cannot reweigh evidence (*Thompson, supra*, 6 Cal.App.5th at p. 981) or disturb the court's express or implied resolution of conflicting inferences (see *McCord, supra*, 51 Cal.App.5th at p. 364 ["If two or more reasonable inferences can be reasonably deduced from the facts, we have no authority as a reviewing court to substitute our judgment for the trial court's judgment."]).

Father also contends the trial court's reliance on his failure to back away from Mother or disarm her shows it relied on a mode of analysis that was found to be erroneous in *Vinson, supra*, 93 Cal.App.5th 1166.  *Vinson* is distinguishable.  *Vinson* involved a mother's request for a DVRO against her children's father.  In her application, she alleged a 10-year history of verbal, mental, and physical abuse, including that the father had punched her in the face and pushed her to the ground, and had threatened to kill her on numerous occasions (including in text messages that she submitted), culminating in an incident when she was in the car with him on the way to get groceries and he " 'began threatening to beat [her] face in' and 'stated that he would kill [her].' " (*Id.* at p. 1170.)

Because both parties were self-represented at the DVRO hearing, the trial court questioned the parties.  (*Vinson, supra*, 93 Cal.App.5th at p. 1171.)  When it questioned the mother about the incident in the car, it remarked on its impression of her answers, repeatedly expressing disbelief that she would let the father in her car if she believed his threats to kill her.  (*Id.* at p. 1172.)  When the mother tried to explain herself by stating the father " 'play[ed] on [her] sympathy' " and " 'we do have children together,' " the court rejected her explanation, commenting that " 'no children were present'" in the car during the incident.  (*Id.* at p. 1177.)  The father, for his part, merely testified that

25

he "ha[d] not threatened to kill [the mother] *multiple times.*'" (*Id.* at p. 1172, italics added.) The court denied the DVRO, citing "'issues of credibility'" and reasoning that the mother "'repeatedly goes back and has contact with [the father,] [s]o it's clear to the Court that she's not particularly concerned about his comment that he will kill her.'" (*Id.* at pp. 1173–1174.)

The Court of Appeal reversed, holding the trial court's denial of the DVRO request had to be reconsidered. (*Vinson, supra*, 93 Cal.App.5th at pp. 1174–1180.) The appellate court explained it was evident from the trial court's questions and remarks that it saw the mother's choice to maintain contact with the father as undermining her credibility. (*Id.* at p. 1176.) But although credibility determinations are subject to extremely deferential review, in the appellate court's view the trial court had "adopted too cramped a view of how battered women should react to threats and abuse in rejecting [the mother's] testimony that she believed [the father's] threats and feared he would kill her." (*Id.* at p. 1177; see also *id.* at p. 1176 ["'"[a]ll women exposed to violence and abuse in their intimate relationships do not respond similarly, contradicting the mistaken assumption that there exists a singular 'battered woman profile'"'"].) The appellate court reasoned that the trial court's comments on the mother's testimony "reflect[ed] a basic misunderstanding of [the mother's] explanation" for maintaining contact with the father. (*Id.* at p. 1177.)

In addition, the DVRO hearing was brief, and the trial court's questioning focused on the car incident while ignoring other alleged instances of abuse as well as other evidence. (*Vinson, supra*, 93 Cal.App.5th at pp. 1177–1178.) The appellate court stated that if admissible and credited, this additional information would have established abuse within the meaning of the DVPA, and yet the trial court did not appear to acknowledge or

evaluate any of it. (*Id.* at pp. 1178–1179.) This was not to say that the trial court "was required to believe any or everything [the mother] or any other witness said; the evidence was not undisputed, and we cannot say [the mother] was entitled to the order she sought as a matter of law." (*Id.* at p. 1180.) However, she was entitled to full consideration of her case, and accordingly the denial had to be reversed and the matter remanded for reconsideration of whether to grant the requested DVRO. (*Ibid.*)

Turning back to this case, Father claims this case is like *Vinson* because the trial court relied on his actions (not disarming or backing away from Mother or calling the police) in concluding his calm was not destroyed by the knife incident. He argues that by relying on these facts as evidence of his lack of fear the court revealed "an erroneous expectation of a uniform reaction to threats of violence." We believe this overstates the holding of *Vinson*. Trial courts are permitted to draw inferences about a party's subjective state of mind from circumstantial evidence. (*Smith, supra*, 188 Cal.App.4th at p. 36; see *ibid.* ["Circumstantial evidence is relevant if it has any 'tendency in reason to prove or disprove' the disputed fact."].) *Vinson* did not overturn or limit this general rule. *Vinson* did not hold that a trial court errs whenever it relies on a party's behavior to infer their mental or emotional state, nor did it rule that an alleged abuse victim's behavior, such as remaining in contact with the alleged abuser, can only support inferences that favor the alleged victim. Rather, in *Vinson*, the trial court's error was in failing to appreciate that the mother's behavior was capable of supporting dual inferences. This error was affirmatively demonstrated by the record, because the court's questioning, commentary, and extensive remarks revealed the flaws in its analysis and misunderstanding of the mother's explanation of her behavior.

27

Here, Father identifies no instance in which the trial court made remarks or comments that displayed a cramped or unduly narrow view of how alleged abuse victims should act. He therefore fails to show the court committed the errors that required reversal in *Vinson*. Instead, he merely complains about the trial court's reliance on his outward behavior to impliedly reject his claim that he was afraid. But *Vinson* does not preclude courts from relying on such evidence to infer the inner state of the alleged victim. For these reasons, Father's reliance on *Vinson* does not persuade us that the trial court erred.

Finally, Father also seeks to relitigate the significance of certain facts that were not expressly relied on by the trial court. For example, he claims his decision to take the baby for a walk after the knife incident "demonstrate[d] [his] presence of mind in a crisis" and did not "suggest[ ] a lack of fear," and he asserts that Mother's behavior after the incident was "surreal" and "underscore[d] [his] concern." Even if we were to agree with Father's assertions, we would not conclude that the court erred. When an appellant challenges a trial court's resolution of a disputed factual issue, the relevant question on appeal is whether substantial evidence supports the court's factual finding, "not whether a contrary finding might have been made." (*In re Marriage of Fregoso & Hernandez, supra*, 5 Cal.App.5th at p. 702.) Father has not asserted a substantial evidence challenge to the court's factual finding. As a result, his ability to identify facts that might have warranted a different finding is of no moment.

For all these reasons, Father fails to carry his appellate burden of demonstrating that the trial court erred when it impliedly found he was not afraid of Mother and ruled that the knife incident did not constitute a disturbance of his peace because it did not destroy his calm.

28

## III.

*Father Fails To Establish That the Trial Court Otherwise Erred*

Father's remaining assertions of error are: (1) the trial court erred in "not finding . . . pointing a knife toward [Father] was threatening conduct," and thus domestic violence,; and (2) Mother's "threat of suicide, demonstrated by pointing a knife at herself and stating 'why don't you just kill me?' in reaction to [Father's] intimation to end the marriage, was coercive control and thus domestic violence." (Boldface and capitalization omitted.) We conclude these arguments lack merit.

Starting with Father's first argument, his claim that the trial court was required to find that pointing a knife toward him was threatening conduct is true only if the evidence presented to the court compelled this conclusion as a matter of law. Again, an issue is one of law when it rests on undisputed evidence and the inferences arising from that evidence are not conflicting. (*Pinto, supra*, 61 Cal.App.5th at p. 689.) Here, the evidence relevant to whether Mother threatened Father was not undisputed. Father's argument that pointing a knife toward him constituted "threatening" conduct omits an essential fact explicitly found to be true by the trial court, namely that Mother said " 'why don't you just *kill me*?' " (italics added) as she held the knife. Even if we were to agree with Father that Mother's act of holding the knife toward him was an implied threat to harm him, Mother's words revealed the object of her threat was herself, not him. Thus, the material facts were not undisputed, and the court was not required to find that Mother threatened Father.

Father's second argument fails because it lacks necessary record support. His argument is that Mother's words, in combination with her act of pointing the knife toward *herself*, constituted coercive control over him and

29

thus domestic violence. (See § 6320, subd. (c) [" 'disturbing the peace of the other party' " includes "coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty"].) This is so, he claims, because Mother's intent was to "try to keep [Father] in the relationship" and "to exploit [Father's] compassion, fear, and sense of responsibility, thereby restricting his autonomy and decision-making freedom." But these are factual assertions, and Father fails to provide citations to record evidence that supports them. (See Cal. Rules of Court, rule 8.204(a)(1)(C).) As a result, we disregard the assertions. (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970.) Our disregard of Father's factual assertions is fatal to his claim that Mother acted with the intent he describes and therefore committed an act of coercive control. Father's theory of coercive control also fails for a second reason, namely that it is forfeited because he did not raise it in the trial court. (See *Tanguilig v. Neiman Marcus Group, Inc.* (2018) 22 Cal.App.5th 313, 330 ["an appellant may not raise a new theory on appeal when the theory rests on facts that were either controverted or not fully developed in the trial court"].) In his reply brief, Father raises a third argument: Mother made a "knowingly false threat to commit suicide," which was " 'threatening' " conduct under section 6320 and thus domestic violence as a matter of law. Because Father raises this argument for the first time in reply without a showing of good cause for his delay, the claim is forfeited. " 'We will not ordinarily consider issues raised for the first time in a reply brief. . . . Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue.' " (*United Grand Corp. v. Malibu Hillbillies,*

30

*LLC* (2019) 36 Cal.App.5th 142, 158, citation omitted.)  Father also falls short of persuading us that his argument has merit, because he fails to show the threatening conduct that will support issuance of an injunction under section 6320 includes an asserted threat that the alleged perpetrator makes against herself.

## DISPOSITION

The January 12, 2024 FOAH is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

DO, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.

31